# United States Court of Appeals
## For the First Circuit

---

No. 12-2256

LISANDRO JONATHAN DARÍN,

Petitioner, Appellant,

v.

LUA CECILIA OLIVERO-HUFFMAN,

Respondent, Appellee.

---

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Camille L. Vélez-Rivé, U.S. Magistrate Judge]

---

Before

Howard, Ripple,[*] and Thompson,
Circuit Judges.

---

Rubén T. Nigaglioni, with whom Nigaglioni Law Offices P.S.C. was on brief, for appellant.
Charles S. Hey-Maestre, with whom Maricarmen Carrillo-Justiniano and Servicios Legales de Puerto, Inc. were on brief, for appellee.

---

March 19, 2014

---

[*] Of the Seventh Circuit, sitting by designation.

**THOMPSON, Circuit Judge**.  This is an appeal from the denial of a petition for the return of a child to Argentina under the Hague Convention on the Civil Aspects of International Child Abduction, Oct. 25, 1980, T.I.A.S. No. 11,670, 1343 U.N.T.S. 89, reprinted in 51 Fed. Reg. 10494-01 (Mar. 26, 1986) ("Convention"), and its implementing statute, the International Child Abduction Remedies Act ("ICARA"), 42 U.S.C. §§ 11601-11611 (2000).  Lisandro Jonathan Darín ("Darín") initiated these proceedings against Lua Cecilia Olivero-Huffman ("Olivero"), seeking the return of their son ("LAD") to Argentina from the United States.  The district court denied the petition, and this appeal followed.  We reverse and remand.

## I. FACTUAL BACKGROUND

Darín is a citizen of Argentina.  Olivero is a United States citizen from Puerto Rico.  The parties first met at some point between 2004 and 2005 at a friend's gathering in Argentina. Olivero had traveled to Argentina in 2004 to visit a friend, and decided to stay for a full year to study dance therapy.  She ultimately enrolled in a three year program.  In 2005, Olivero returned to the United States, where she worked for six months in order to afford her dance therapy studies.  She then went back to Argentina.  In 2006, Olivero and her sister bought an apartment in Buenos Aires, Argentina.

Although the parties had met earlier, it was not until 2007 that they entered into a romantic relationship. Quickly thereafter, Olivero became pregnant, and by then the parties were living together in Olivero's apartment. During the pregnancy, Darín and Olivero traveled together to the United States, returning to Argentina prior to the arrival of their son. LAD was born in Buenos Aires on April 20, 2008, and is a citizen of both the United States and Argentina. Following the birth of their son, the parties moved into a Buenos Aires apartment Darín had inherited from his father.

On December 11, 2008, Darín and Olivero took LAD to the United States for approximately two months, returning to Argentina on February 9, 2009. All three traveled again to the United States on March 24, 2009, where they remained until August 7, 2009. As before, they returned to Argentina. On January 19, 2010, Olivero and LAD traveled to the United States -- without Darín -- under a power of attorney ("POA") signed by the parties in Argentina, pursuant to which LAD was authorized to travel to any country in the world accompanied by either parent. While in the United States, Olivero informed Darín she and LAD were not returning to Argentina in March as the parties had previously agreed, that she did not want to return, and that she did not know when they would return. Despite her expressed reservations, mother and son

ultimately went back to Argentina in April 2010, just before LAD's second birthday.

The couple separated upon Olivero's return, but continued to live in the same Buenos Aires apartment for two and a half months. At this point, Darín revoked the POA, seemingly so that Olivero could no longer take their son out of Argentina without him. According to his testimony, he did so because he did not trust her anymore. Olivero and LAD eventually moved back into her apartment in Buenos Aires, and LAD began attending a nearby kindergarten. LAD split his time between his mother's apartment and his father's.

Darín and Olivero's separation lasted approximately seven months. During this period, and unbeknownst to Darín, Olivero consulted "a couple of lawyers" in Argentina to explore methods of taking the child to the United States without the child's father's consent. One lawyer counseled her on how to ask for custody in Argentina, while others advised her that she "had a better chance of returning to [the United States]" if she asked for custody in Puerto Rico. After pondering whether she should seek custody of LAD in the United States, Olivero decided against it because it "wasn't something [she] was able to do."

On November 9, 2010, Olivero made a quick trip to the United States by herself -- presumably because Darín had revoked the POA that allowed either parent to take LAD out of the country

-- leaving LAD in Darín's care.  Soon after her return, Olivero and Darín reconciled and, by January of 2011, were living together once again.[1]  The reconciliation, however, was short-lived as it was quickly followed by the decision that ultimately led to their protracted legal quarrel, which culminated in this appeal.

On January 31, 2011, the family traveled to the United States.  Their first stop was Orlando, Florida, where they spent a total of four days.  The family then moved on to Puerto Rico.  At the outset of the trip, the plan was to spend some time in Puerto Rico with Olivero's family and then fly back to Argentina on March 2, 2011.  However, during their stay in Puerto Rico, the plan began to change and the date of return was pushed back due to Olivero's involvement in a car accident and her apparently new-found interest in pursuing a business venture with her sister.  Around mid-March 2011, Olivero announced to Darín that neither she nor LAD would be returning to Argentina.  Darín remained on the island as long as he could, but his tourist visa was set to expire in July 2011.

On July 7, 2011 -- just two days before Darín's departure -- Darín and Olivero executed an affidavit regarding the care and supervision of their son during Darín's absence (the "Affidavit").  Olivero drafted the Affidavit herself.  The Affidavit's terms

---

[1] Olivero testified it was not until after she realized that she was unable to heed the Argentine lawyers' advice to seek custody in the United States that she decided to reconcile with Darín.

authorized her to take any steps necessary to provide for the education, health care, and overall well-being of the child. A provision authorizing the child to travel with either parent was there as well. At Darín's insistence, language was included stating he was leaving the United States "against his will" and was not abandoning his child. He eventually left the country on July 9, 2011.[2] Thereafter, although separated geographically, Darín maintained continuous and frequent communication with his son.

On November 18, 2011, Olivero filed for legal custody of LAD in Puerto Rico state court. According to the custody petition, Olivero filed so that she could "send [LAD] to visit [Darín] at Christmas," since they had not been able to reach an agreement and she feared the retention of the child.[3] On December 19, 2011, Darín filed an application under the Convention with the Argentina Central Authority requesting the return of his son to Argentina. On February 22, 2012, Darín filed the instant action with the federal district court in Puerto Rico, alleging Olivero's actions amounted to a "wrongful retention" of his son.

---

[2] The parties agree Darín returned to Argentina because his tourist visa was expiring and because he needed to work.

[3] The record contains Olivero's Puerto Rico state court petition for custody dated November 18, 2011. However, we cannot find anything in the record as to when or whether Darín was served or otherwise put on notice of this action.

## II. PROCEEDINGS BELOW

According to Darín's petition, Olivero wrongfully removed or retained LAD in the United States in violation of his joint custody rights. Olivero countered that there was no wrongful removal or retention because Darín had "expressly acquiesced and consented to" the child residing with her in the United States for an indefinite period of time, and that he did so by executing the Affidavit.

There were two jointly stipulated issues before the district court: (1) "whether or not an unlawful retention or removal of the child occurred in this case, notwithstanding [Darín's] express consent, given under affidavit, to the child staying in Puerto Rico under [Olivero's] care and supervision, for an indefinite period of time;" and (2) "whether Puerto Rico ha[d] become the child's habitual residence and hence the Puerto Rico Courts ha[d] jurisdiction to determine permanently the best interests of the child and to rule on any controversies between the parties regarding parental custody and visitation rights."

After holding a three-day evidentiary hearing where both parties had an opportunity to testify,[4] the district court concluded that Darín had not met his burden of establishing a wrongful removal or retention. Indicating that the alleged removal

---

[4] Darín testified on his own behalf and called Olivero as a witness. Olivero testified on her own behalf.

-7-

or retention had occurred in July 2011, on the date which Darín left Puerto Rico,[5] the court found that as of that time "a new habitual residence in [the United States] was acquired based on the parents' shared intention in signing the affidavit."  In other words, Darín had, according to the court, "acquiesced/consented"[6] to LAD remaining in Puerto Rico.  The court concluded that because LAD "was a habitual resident of Puerto Rico at the time of the claimed removal or retention," the retention or removal was not wrongful.  The court held that the courts of Puerto Rico, as opposed to Argentina, had jurisdiction to determine any and all custody disputes.  Consequently, it denied Darín's petition and dismissed his claims, with prejudice.  Darín timely appealed.

## III. THE CONVENTION

Before tackling the merits of the matter at hand, we provide some context.  The Convention is a multilateral agreement

---

[5] The court saw the date of retention or removal as a clear-cut issue, indicating in a footnote:  "We note the date on which the removal or retention took place is not an issue in this case inasmuch as it is undisputed Petitioner left Puerto Rico to [sic] Argentina on [sic] July 2011 and left his son under the care and supervision of his mother after signing an affidavit."

[6] As will be explained later, consent and acquiescence are considered defenses or exceptions to a finding of wrongful removal or retention.  However, here the district court seemed to consider consent and acquiescence in connection with its inquiry about whether a wrongful removal or retention had occurred in the first place.

between ninety-one nations[7] that was adopted to counter "the problem of international child abductions during domestic disputes." Abbott v. Abbott, 560 U.S. 1, 8 (2010). Its objective is "to secure the prompt return of children wrongfully removed to or retained in any Contracting State, and to ensure that rights of custody and of access under the law of one Contracting State are effectively respected in the other Contracting States." Id. (citation omitted) (internal quotation marks omitted). And the overriding intent is "to restore the pre-removal status quo and to discourage a parent from engaging in international forum shopping." Kufner v. Kufner, 519 F.3d 33, 38 (1st Cir. 2008) (citing Whallon v. Lynn, 230 F.3d 450, 455 (1st Cir. 2000)). "The entire purpose of the Convention is to deter parents from absconding with their children and crossing international borders in the hopes of obtaining a favorable custody determination in a friendlier

---

[7] As of January 27, 2014, ninety-one countries had signed on. Hague Conference on Private International Law, Status table 28: Convention of 25 October 1980 on the Civil Aspects of International Child Abduction, http://www.hcch.net/index_en.php?act=conventions.status&cid=24 (last visited February 3, 2014).

jurisdiction."[8] Walker v. Walker, 701 F.3d 1110, 1116 (7th Cir. 2012).

The idea is that a child's best interests are better served when decisions about custody rights are made in the country of habitual residence. See Abbott, 560 U.S. at 20. Thus, ordering the return of a child "does not alter the existing allocation of custody rights." Id. Instead, it allows "the courts of the [child's] home country to decide what is in the child's best interests." Id. For this reason, the Convention establishes a strong presumption in favor of returning a wrongfully removed or retained child. See Kufner, 519 F.3d at 38 (citing 42 U.S.C. § 11601(a)(4)). However, the Convention provides for certain exceptions or defenses to this general rule. See Walsh v. Walsh, 221 F.3d 204, 216-17 (1st Cir. 2000).

With this bigger picture in place, we turn to the parties' contentions on appeal and the criteria of our review.

---

[8] ICARA, the Convention's implementing statute, is true to the Convention's purpose. According to congressional findings at the time of its enactment, "[i]nternational abductions and retentions of children are increasing, and only concerted cooperation pursuant to an international agreement can effectively combat this problem." 42 U.S.C. § 11601(a)(3). Congress concluded that "[p]ersons should not be permitted to obtain custody of children by virtue of their wrongful removal or retention." Id. § 11601(a)(2). To ensure the prompt return of wrongfully removed or retained children, Congress gave state and federal district courts concurrent original jurisdiction over actions arising under the Convention. Id. § 11603(a). Their authority is limited to the determination of rights under the Convention "and not the merits of any underlying child custody claims." Id. § 11601(b)(4).

## IV. ARGUMENTS

More on the nitty-gritty of the parties' positions will follow, but here it suffices to note the following. Darín, for his part, argues that Argentina is LAD's habitual place of residence and that he has been wrongfully retained in Puerto Rico by Olivero in violation of Darín's custodial rights. Olivero counters that there has been no retention because both parents agreed (via the Affidavit) that LAD would stay in Puerto Rico under her care. Further, Olivero says, even assuming there was a retention, it was not wrongful (as that term is contemplated by the Convention) because she and Darín agreed that Puerto Rico was LAD's habitual residence. She suggests that we consider not only the fact that this change in geography was agreed to, but also LAD's extended involvement with his family and community in Puerto Rico.

Finally, Olivero contends that, even were we to find that LAD was wrongfully retained in violation of the Convention, she has some defenses at her disposal. Specifically, Olivero claims that Darín consented to LAD remaining in Puerto Rico or, at a minimum, subsequently acquiesced to this arrangement. Darín steadfastly maintains that he never did either.

## V. STANDARD OF REVIEW

We review the district court's findings of fact for clear error. <u>Charalambous</u> v. <u>Charalambous</u>, 627 F.3d 462, 466 (1st Cir. 2010) (citing <u>Danaipour</u> v. <u>McLarey</u>, 286 F.3d 1, 13 (1st Cir.

-11-

2002)).  Under this standard, a district court's plausible interpretation of the facts cannot be rejected just because the record might sustain a conflicting interpretation.  In re O'Donnell, 728 F.3d 41, 45 (1st Cir. 2013).  "[T]o find clear error, a finding must hit us as more than probably wrong -- it must prompt a strong, unyielding belief, based on the whole of the record, that the judge made a mistake."  Id. (citations omitted) (internal quotation marks omitted).  The district court's interpretation of the Convention, along with its application of the Convention to the facts, are reviewed de novo.  Felder v. Wetzel, 696 F.3d 92, 98 (1st Cir. 2012) (citations omitted).

With regard to the district court's determination of habitual residence in particular -- after finding no operative First Circuit case -- we have considered, and find helpful, the Seventh Circuit's approach.  That court stated: "determinations of intent involve questions of fact and we will defer to the district court's findings on intent unless they are clearly erroneous," while "[t]he ultimate determination of habitual residence is a mixed question of law and fact to which we will apply de novo review."  Koch v. Koch, 450 F.3d 703, 710 (7th Cir. 2006).  Seeing no reason to depart from this approach, we now adopt it.

## VI. WRONGFUL RETENTION

We begin by considering whether there has been a wrongful retention within the meaning of the Convention.[9]   42 U.S.C. § 11603(e)(1)(A).   The law tells us that a retention is wrongful when:  (1) "it is in breach of rights of custody attributed to a person, an institution[,] or any other body, either jointly or alone, under the law of the State in which the child was habitually resident immediately before the . . . retention;" and (2) "at the time of . . . retention[,] those rights were actually exercised, either jointly or alone, or would have been so exercised but for the . . . retention." Convention, supra Article 3 at 1501.  And in the event of a wrongful retention of a child, the return of the child to his or her country of habitual residence is ordinarily called for.  See Walsh, 221 F.3d at 216.

Pursuant to ICARA, the petitioner bears the burden of proof by a preponderance of the evidencce, 42 U.S.C. § 11603(e)(1), and the petitioner must show that:  (1) the country to which the

---

[9] As referenced earlier, wrongful retention is not the only grounds for return of a child; wrongful removal can suffice as well.  But it is clear that we are not dealing with a case of wrongful removal here.  LAD left Argentina with both Darín and Olivero, who made the mutual decision to travel outside Argentina with the child.  Neither party's custody rights were breached at that point.  Instead, this case concerns the alleged wrongful retention of LAD by Olivero in the United States.  Notably Darín, although he might suspect that the 2011 trip was part of a scheme to bring LAD into the country, does not argue otherwise.  Therefore, this is the last we need to say on the concept of removal with respect to this case.

child's return is sought was the child's habitual residence immediately prior to the retention; (2) the petitioner had custody rights over the child at the time of the retention; and (3) the petitioner was exercising those custody rights.  See Nicolson v. Pappalardo, 605 F.3d 100, 103 (1st Cir. 2010).  While the burden is on the petitioner, we often hone in on the respondent parent's actions to determine whether a wrongful retention has occurred. See, e.g., id. at 105 (focusing on the facts surrounding the respondent mother's removal of the child from Australia to the United States and her actions after she arrived in the United States); Zuker v. Andrews, 2 F. Supp. 2d 134, 140 (D. Mass. 1998) (concentrating on the respondent mother's decision to rent her own apartment in the United States), aff'd by Zuker v. Andrews, 181 F.3d 81, 1999 WL 525936 (1st Cir. 1999).

Here, the issues are narrowed.  No one disputes that Darín had custody rights over LAD or that he was exercising them at the time of the alleged retention.[10]  The only question is whether Darín has been able to establish by a preponderance of the evidence that Argentina (the country he seeks to return his son to) was LAD's habitual residence prior to his retention.  The district court thought Darín fell short, but our de novo review causes us to disagree.  We explain.

---

[10] Such a claim would be dubious at best, as the very language of the Affidavit, which Olivero drafted, states "both [Olivero and Darín] are the parents with custody of [LAD]."

-14-

## A. Date of Retention

The first place we diverge from the district court is the question of when LAD's alleged retention occurred. This issue is important because, as we said, Darín needs to prove that Argentina was LAD's habitual residence immediately prior to the retention in order for the retention to be wrongful. See Nicolson, 605 F.3d at 103. As noted above, the district court indicated in a footnote that it was clear that the relevant date of retention was July 2011, which was when Darín left Puerto Rico. Darín, however, in his original petition with the district court, and before this court, argued that the retention occurred in mid-March 2011, when Olivero informed him that she would be remaining in Puerto Rico.[11] We find the record as a whole supports Darín's position.

The record reflects that the parties traveled from Argentina to the United States in late January 2011 for vacation purposes. They were scheduled to return to Argentina on March 2, 2011. That departure date was "delayed" due to Olivero's involvement in a car accident and her interest in pursuing a business venture. At first, Darín went along with the delay --

---

[11] Though only a difference of a few months, the divergence between the March 2011 date (when Olivero told Darín she wanted to stay) and the July 2011 date (when Darín left Puerto Rico) is significant in that the Affidavit was signed in between those two dates. As we will explain further, because the district court went with the July date, it included in its analysis, and relied quite heavily on, the Affidavit to support its finding that Puerto Rico had become LAD's habitual residence.

testifying "with a tragedy like that, I said that it was fine" -- while remaining under the impression that they would return to Argentina. By mid-March 2011, Olivero made it clear to Darín that she and their son would be permanently residing in the United States.[12] This last detail is crucial to our date of retention analysis. We are mindful that "[i]t is not easy . . . to attach an abstract label to a complex of discrete facts," especially where subjective intent is at issue. Nicolson, 605 F.3d at 105. This is perhaps even more so true where the complexities of intimate human relationships are concerned. Even so, we are confident that Olivero's mid-March declaration that she would remain in the United States merits the significance we have placed on it. Her actions afterwards only confirm this. Olivero, true to her word, refused to return to Argentina.

Once Olivero decided to stay in the United States with the child, there was nothing Darín could do to prevent a separation from his son. His tourist visa excluded the possibility of staying indefinitely with LAD in the United States, and he could not take LAD back to Argentina because the POA authorizing the child to travel with only one parent had been revoked. Basically, as of mid-March 2011, Darín had no legal way of remaining with his son.

_____

[12] According to the district court's opinion, "[i]t is uncontested that, by mid March 2011, [Olivero] told [Darín] of her intentions to reside permanently in Puerto Rico with the child."

-16-

We are cognizant of the deferential standard of review that we must afford the district court's fact-bound determinations, see Charalambous, 627 F.3d at 466, but we do not think the record permits the conclusion drawn by the district court with regards to the issue of retention. The court clearly erred in finding that the retention occurred in July. The alleged wrongful retention in fact occurred in mid-March 2011.

## B. Habitual Residence

Given our determination on the date of retention, the question now becomes whether Argentina -- i.e., the country to which the child's return is being sought -- was LAD's habitual residence in mid-March 2011.

"[A] child's habitual residence is the place where he or she has been physically present for an amount of time sufficient for acclimatization and which has a 'degree of settled purpose' from the child's perspective." Feder v. Evans-Feder, 63 F.3d 217, 224 (3d Cir. 1995). This determination "must focus on the child and consists of an analysis of the child's circumstances in that place and the parents' present, shared intentions regarding the child's presence." Id. The required degree of settled purpose does not necessarily entail an intention to stay in the place indefinitely; it "may be for a limited period." Id. at 223. It could encompass one or multiple goals, and be either general or specific. Id. For example, a settled purpose with respect to

-17-

residence could be "[e]ducation, business or profession, employment, health, family or merely love of the place." Id.

In cases involving more than one potential residence, a distinction must be made between the abandonment of a prior habitual residence and the acquisition of a new one. See Mozes v. Mozes, 239 F.3d 1067, 1075 (9th Cir. 2001). A person cannot acquire a new habitual residence without "forming a settled intention to abandon the one left behind." Id. "Otherwise, one is not habitually residing; one is away for a temporary absence of long or short duration." Id. This settled intention "could coalesce during the course of a stay abroad originally intended to be temporary." Id.

When the question is whether a young child -- lacking both the material and psychological means to decide where he or she will reside -- has abandoned a prior habitual residence, "the intention or purpose which has to be taken into account is that of the person or persons entitled to fix the place of the child's residence." Mozes, 239 F.3d at 1076 (citations omitted) (internal quotation marks omitted). And "when the persons entitled to fix the child's residence no longer agree on where it has been fixed," then the "courts must determine from all available evidence whether the parent petitioning for return of a child has already agreed to the child's taking up habitual residence where it is." Id.

-18-

Generally, it is "the parents' shared intent or settled purpose regarding their child's residence" that guides our inquiry. Nicolson, 605 F.3d at 103-04 (emphasis added) (citing Barzilay v. Barzilay, 600 F.3d 912, 918 (8th Cir. 2010); Maxwell v. Maxwell, 588 F.3d 245, 251 (4th Cir. 2009); Koch, 450 F.3d at 715; Gitter v. Gitter, 396 F.3d 124, 131-32 (2d Cir. 2005); Mozes, 239 F.3d at 1076-81; Feder, 63 F.3d at 224). One parent's wishes are not sufficient, by themselves, to effect a change in a child's habitual residence. See Feder, 63 F.3d at 224-26 (finding a unilateral decision or change of heart by one party cannot alter the parties' shared intent regarding habitual residence). Nevertheless, "a child can lose its habitual attachment to a place even without a parent's consent . . . if the objective facts point unequivocally to a person's ordinary or habitual residence being in a particular place." Mozes, 239 F.3d at 1081 (citation omitted) (internal quotation marks omitted). After all, "[h]abitual residence is intended to be a description of a factual state of affairs." Id.

Utilizing Darín's July 2011 departure date as the operative date of retention, the district court found that the Affidavit (signed a couple days before), "clearly show[ed] the parents' last shared intent in determining habitual residence." According to the district court, even though the original purpose of the January 31, 2011 trip to Florida and Puerto Rico was for vacation and not for relocation, the parties' shared intent changed

while in Puerto Rico.  It found significant the Affidavit's open-ended nature in not setting forth an end date for its provisions regarding the care and supervision of LAD.  It also found telling that "there ha[d] been a change in geography for an 'appreciable period of time' that [was] 'sufficient for acclimatization.'"  The court's ultimate conclusion: the United States was LAD's habitual residence prior to the alleged retention.  After conducting a de novo review, we conclude that this determination is flawed.

Here, a thorough audit of the record reveals there is no evidence to plausibly support the district court's determination that the United States, not Argentina, was LAD's habitual residence.  First, we note that the signing of the Affidavit -- on which the district court placed so much importance -- is irrelevant to our present inquiry.  We are looking for LAD's habitual residence immediately before the retention and the Affidavit was signed on July 7, 2011, while the retention (for the reasons explained above) took place months earlier in mid-March 2011.

Based on the uncontested facts, it is safe to say that, prior to mid-March 2011, the parties' shared intent was not for the child to be a habitual resident of the United States.  In fact, it was the parties' shared intent to return to Argentina on March 2, 2011.  And Olivero does not deny this was the plan; in fact, she

testified as much.[13]  Olivero admits it was she who had a change of heart once in Puerto Rico and decided to stay there with her son. It was her wish that they stay in the United States with her family.  Unfortunately for Olivero, a unilateral decision is not enough.  See Feder, 63 F.3d at 224-26.  There is simply no evidence in the record from which the district court could have found a mutual intent to change their son's habitual residence on the date of retention.

Furthermore, the district court was misguided in emphasizing LAD's acclimatization to the United States for purposes of its habitual residence determination.  Evidence of acclimatization is not enough to establish a child's habitual residence in a new country when contrary parental intent exists. See Mozes, 239 F.3d at 1078-79.[14]  A "change in geography" and "the passage of an appreciable period of time . . . that is sufficient for acclimatization" are considerations for the court when "the decision to alter a child's habitual residence depends on the

_____

[13] When asked whether, at the time the family was in Orlando, she still intended to return to Argentina, Olivero responded:  "Our plans were to come to Puerto Rico and spend some time here and, then, at the time, go back to Argentina."

[14] Of course, some situations will arise where "a child's life may become so firmly embedded in the new country as to make it habitually resident even though there be lingering parental intentions to the contrary," but this is precisely why the determination of habitual residence is made on a case-by-case basis.  Mozes, 239 F.3d at 1078.  And this was not LAD's situation in mid-March 2011.

[shared] settled intention of the parents."  Id. at 1078 (citations omitted) (internal quotation marks omitted).  In the absence of shared parental intent, the district court should have "be[en] slow to infer . . . an earlier habitual residence has been abandoned." Id. at 1079.

As of mid-March 2011, the objective facts do not point unequivocally to LAD's habitual residence being the United States. If anything, an objective observer would think Argentina was LAD's habitual residence: his father was a citizen of Argentina; his parents' relationship began and flourished in Argentina; he was born in Argentina -- indeed, his mother flew to the United States when she was pregnant with him, but returned to Argentina to give birth; he had Argentine citizenship; his first months of life were spent in Argentina where his parents lived; and he returned to Argentina every time he traveled to the United States.  See Nicolson, 605 F.3d at 104 (applying the lens of an objective observer to determine whether the child was a habitual resident of Australia).  Before the parties' trip to the United States on January 31, 2011, LAD had been living in Argentina for two years. He had started kindergarten, which he had been attending for four months and which he was supposed to start again in March 2011.[15] Furthermore, the child had a grandmother, a great-grandmother and cousins in Buenos Aires, with whom we must assume he had strong

---

[15] The school year in Argentina is from March to December.

-22-

ties.[16]  The record simply does not support the district court's conclusion that the United States, and not Argentina, was LAD's habitual residence.

Further, the fact that LAD may have spent more aggregate time in the United States than in Argentina (a stat that Olivero emphasizes), is not dispositive.  It is only one factor in our analysis.  See Barzilay, 536 F.3d at 851-52 (determining a child's habitual residence requires analyzing many factors, amongst which are a change in geography and the passage of time).  The fact that a child frequently visits relatives in another country for extended periods of time, by itself, does not mean the second country is or becomes the child's habitual residence.  Cf. Mozes, 239 F.3d at 1074 ("The obvious reason why [a] camper is not regarded as habitually resident [of the summer camp] is that he already has an established habitual residence elsewhere and his absence from it-even for an entire summer-is no indication that he means to abandon it.").

The evidence on record does not show that the parties shared an intent to change LAD's habitual residence to the United States, but instead it points only to Olivero's individual intent

---

[16] Olivero, herself, testified that after July 2011, she "made [LAD] call his grandmother and great-grandmother" because "[she] wanted him to have relation [sic] with them."  We do not see why this would not be the case when the child was living in the same country as these family members, as the natural implication of this testimony is that Olivero wished to continue an already existing relationship with LAD's paternal family.

to do so.  Accordingly, we conclude that the court's finding otherwise was clearly erroneous.  For all the foregoing reasons (and applying the de novo standard of review the ultimate habitual residence determination calls for) we find that Darín has established by a preponderance of the evidence that LAD's habitual residence as of the retention was Argentina.

## C. The End Result

Because there is no dispute as to Darín's custody rights over LAD or that he was actually exercising those rights at the time, it necessarily follows that Olivero wrongfully retained LAD in the United States.  Though we find that a wrongful retention occurred, this determination is not dispositive of the case.  As we mentioned earlier, the Convention provides for certain exceptions or defenses to the return of a child to his or her country of habitual residence following a wrongful retention.  See Nicolson, 605 F.3d at 105.  And so, we turn our attention to the defenses maintained by Olivero.

## VII. DEFENSES

Among the Convention's provided-for exceptions to a child's return -- and the ones that Olivero asserts here -- are consent and acquiescence.[17]  See Convention, supra Article 13a at

---

[17] The other exceptions are:  (1) the existence of a grave risk that the child's return "would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation," Convention, supra Article 13b at 1502; (2) "[t]he return of the child . . . would not be permitted by the fundamental

-24-

1502 ("[T]he judicial or administrative authority of the requested State is not bound to order the return of the child if the person, institution or other body . . . having the care of the person of the child . . . had consented to or subsequently acquiesced in the removal or retention.").  Consent and acquiescence embody two separate defenses.  See Nicolson, 605 F.3d at 103.  "The consent defense involves the petitioner's conduct prior to the contested removal or retention, while acquiescence addresses whether the petitioner subsequently agreed to or accepted the removal or retention."  Baxter v. Baxter, 423 F.3d 363, 371 (3d Cir. 2005) (emphases added) (citing Gonzalez-Caballero v. Mena, 251 F.3d 789, 794 (9th Cir. 2001)).

In order for the opponent of a child's return to successfully assert either defense, he or she must establish the petitioner's consent or acquiescence by a preponderance of the evidence.  See 42 U.S.C. § 11603(e)(2)(B); see also Nicolson, 605 F.3d at 105.  Further, consent and acquiescence are both

principles of the requested State relating to the protection of human rights and fundamental freedoms," Convention, supra Article 20 at 1503; (3) the petition for return of a child is not commenced within one year of the wrongful removal or retention and "the child is now settled in its new environment," Convention, supra Article 12 at 1502;" and (4) "the person, institution or other body having the care of the person of the child was not actually exercising the custody rights at the time of removal or retention," Convention, supra Article 13a at 1502.  None of these exceptions have been argued here.

-25-

affirmative defenses that should be narrowly construed.  <u>See</u>

<u>Nicolson</u>, 605 F.3d at 105.

Here, the district court -- incorrectly using the terms consent and acquiescence interchangeably -- found that Darín had agreed to LAD remaining in the United States.[18]  It found that Darín, by signing the Affidavit, "voluntarily and without intimidation, threats or coercion" was agreeing that LAD could stay in the United States for an indefinite period of time.  According to the district court, "[i]t is hard to think of a more formal acquiescence or alternatively a waiver of Hague Convention rights than voluntarily entering into an agreement signed before a Notary Public as the one signed in this case."  The court also found that Darín had "consent[ed] to LAD's retention in the United States because he "failed for five (5) months to make any meaningful effort to obtain return of the minor child and failed to pay any child support."

The evidence on record compels us to conclude that the court got it wrong.  We take the two defenses in turn.

---

[18] The district court's analysis of the consent and acquiescence issue is somewhat confusing in that, as we said, it is intermingled with the court's determination of whether a wrongful retention occurred at all.  The court, after discussing both consent and acquiescence in connection with its retention analysis, then included a footnote at the end of the decision, which indicated that "for the sake of the argument," even if Darín had established a wrongful retention, the outcome would have been the same because Olivero had proven the defenses of consent or acquiescence.

## A. Consent

Our determination of whether Darín consented to LAD remaining in the United States must necessarily focus on his intent <u>before</u> the child's mid-March 2011 retention. See <u>Nicolson</u>, 605 F.3d at 105 (citing <u>Baxter</u>, 423 F.3d at 371). "Consent may be evinced by the petitioner's statements or conduct, which can be rather informal." <u>Id.</u> What the petitioner actually contemplated and agreed to, as well as the nature and scope of the petitioner's consent -- including any conditions or limitations -- should be taken into account. See <u>Walker</u>, 701 F.3d at 1122-23.

Right off the bat, we note that our consent inquiry focuses on the time prior to the retention and therefore Darín's signing of the Affidavit is out of play.[19] Rather, we must focus on the parties' conduct prior to mid-March 2011. There is little Olivero can rely on to support a consent defense during this time period.[20] The only imaginable argument would be that Darín consented to LAD's retention because he visited the United States in January 2011 despite his knowledge of Olivero's previous intent

---

[19] Even were we to assume that the district court's July retention date was correct, and therefore the Affidavit should be considered, we would still find that no consent was given. For the same reasons that the Affidavit does not constitute an acquiescence (detailed later), it does not constitute a grant of consent.

[20] Olivero did not differentiate between the defenses of consent and acquiescence in her argument to this court. Nor did she distinguish between the pre-retention and post-retention time periods. Therefore, it is difficult to precisely parse out what her arguments were as to each defense.

to leave Argentina and settle in the United States.  This argument runs against a wall.

Although there is plenty of evidence that Olivero had been looking into moving to the United States with LAD, the only incident the record shows Darín to be aware of was Olivero's attempt to remain with LAD in the United States in March of 2010. According to both parties' testimony, however, they had moved on from this disagreement.  Olivero had returned to Argentina in April 2010 and had decided to stay there, ultimately reconciling with Darín several months later.[21]  The decision to take the January 31, 2011 trip was made after the parties reconciled and moved back in together.  She had apologized for the incident, and he had forgiven her.[22]  At this point in time, Darín was not aware of Olivero's legal inquiries into relocating with LAD to the United States. Darín testified that it was not until after March 2011 that he found out that "during those seven months that she had been in Argentina, she had started to ask around how she could escape from Argentina."

_____

[21] According to Darín's testimony, by the end of January 2011, "[the couple] decided to reconcile."  Olivero admits she "stayed in Argentina . . . [a]nd subsequently . . . tried to make better the situation or . . . reconciliate."

[22] Darín testified: "We were really happy, and our relationship was very good, and she acknowledged to me that she had made a mistake with what she had done. . . . [S]he was . . . my woman. She was the mother of my child.  And my boy was completely happy. I was very happy.  And so, as we say in Argentina, we just moved on."

As we said above, the undisputed evidence shows that when the parties left Argentina, their mutual intent was for a visit of limited duration; they had a scheduled return date of March 2, 2011. It was not unreasonable for Darín to believe that the trip was nothing more than a family vacation, and that they would return together to Argentina just as they had multiple times before. According to Darín's testimony, "[they] tried to travel as much as [they] could so that [LAD] could share with his family . . . in Puerto Rico, and also for [Olivero] to be able to share . . . with her family." The fact that Darín agreed to go on this vacation is not evidence of him consenting to their son relocating to the United States.

In sum, the objective facts in the record point to one conclusion only: Darín did not consent to LAD's retention in the United States in mid-March 2011. Accordingly, Olivero has not made the required preponderance-of-the-evidence showing and her consent defense fails. The outcome of this case turns on whether Darín subsequently acquiesced to the retention.

## B. Acquiescence

Because the defense of acquiescence pertains only to what happened post-retention, the relevant period for us to consider is between mid-March 2011 and Darín's filing of the petition for return on December 19, 2011. See Baxter, 423 F.3d at 371. Acquiescence tends to require more formality than consent -- e.g.,

testimony in a judicial proceeding, a convincing written renunciation of rights, or a consistent attitude over a significant period of time. See id. While some cases present a situation where there is a clear-cut, formal acquiescence -- such as a consent order by a non-U.S. parent agreeing to let a state court decide final custody -- many times, cases present circumstances that are a little hazier. See Nicolson, 605 F.3d at 107. When attempting to characterize ambiguous conduct as a basis for inferred acquiescence, courts employ a pure subjective intent inquiry. See id. Of course, the subjective intent refers to the subjective intent of the parent who is claimed to have acquiesced. See Baxter, 423 F.3d at 371.

Olivero's primary argument is that the Affidavit evidences Darín's acquiescence to LAD remaining in the United States. This is a dead end. Acquiescence to LAD's retention in the United States cannot be found in the plain language of the Affidavit, nor can the Affidavit be read to imply such. The district court was mistaken in concluding it did.

A reading of the Affidavit reveals no mention in the entire two-page document, express or implied, of establishing a new residence in, or permanently relocating to, the United States. It merely states that Darín "must leave the country against his will;" that LAD "is not being abandoned by his father" and "will be under the care and supervision of his mother . . . with his father's

-30-

absence;" that Olivero is authorized "to follow all the necessary steps in order to benefit their child as regards to education, health and all related to the minor's interests and well-being;" and that LAD "is authorized to travel with either parent . . . to any place in the world."  The Affidavit is simply an agreement between parents with joint custody to provide for the care and well-being of their minor son during the forced absence of one parent.  It is but a legal instrument that authorizes Olivero to make decisions for the child's welfare.  Nothing more.

Also, the fact that the Affidavit contains open-ended terms is not evidence that Darín acquiesced to LAD remaining permanently in the United States.  The district court placed too much importance on the Affidavit's indefiniteness and read into it a declaration of acceptance not supported by its language.  While it is true that the Affidavit does not contemplate a specific time period for the duration of its effect, it is improper to transform the absence of an end date into acquiescence.  The mere fact that the Affidavit does not have an expiration date does not necessarily mean it was meant to be permanent; it could very well mean the intended duration was unknown.  And in fact, it would seem the duration was unknown since Olivero did not indicate when, if ever, she would return to Argentina -- a point she equivocated on once Darín returned to Argentina.  Furthermore, logically speaking, one who executes a legal document with the intent of making permanent

a current state of affairs otherwise open to change, expresses as much in it.

If anything, the Affidavit demonstrates Darín's desire to be responsible and provide for his child when his own back was against the wall. Moreover, even when we look beyond the Affidavit's language and instead consider the parties' explanations given at the hearing, we find no support for the district court's conclusion. Both parties testified that they executed the Affidavit so Olivero could take care of LAD while Darín was away.[23] In light of the Affidavit's language and the parties' testimony as to their reasons for its execution, the Affidavit simply cannot be read as a declaration of acquiescence, much less unconditional acquiescence, to the retention of the child in the United States. We emphasize, the defense of acquiescence calls for definiteness and clarity, i.e., a "clear and unequivocal expression of an agreement" or "a convincing written renunciation of rights." Nicolson, 605 F.3d at 108 (citation omitted) (internal quotation marks omitted); see also Baxter, 423 F.3d at 371. The Affidavit falls far short.

---

[23] Olivero testified: "[The Affidavit] was prepared because I wanted to have a document that I could use for our child's education, health, travel, and other things." Darín testified that he signed the Affidavit so Olivero could take care of LAD while he was not with the child, so she could travel with his son to Argentina after July 2011, and to make it clear that he was not abandoning his child.

It appears the district court's reasoning may have been influenced by its belief that the parties had equal bargaining power at the time the Affidavit was executed and that Darín's signing was completely voluntary and uncoerced. We cannot agree. The record -- including, most importantly, testimony from both sides -- reflects the opposite. The reason Darín signed the Affidavit was because he <u>had</u> to. Darín needed to return to Argentina: his travel visa was expiring; he had no work visa; he had no job or income in Puerto Rico; and the $1,700 he and Olivero had brought to Puerto Rico was depleted. In fact, it appears Olivero's uncle purchased Darín's plane ticket home for him. The circumstances were against Darín. He was faced with the choice of either leaving his son behind or remaining in the United States illegally, without a work permit and without legal representation. Had Darín opted to overstay his visa, he could have been subject to arrest and removal proceedings, which would have likewise separated him from his son. We would hardly call Darín's signing of the Affidavit under these circumstances voluntary or uncoerced. If anything, Darín's situation is a lesson in duress.

Moreover, the Affidavit does not support the district court's alternative finding that it functioned as a renunciation of rights under the Convention. The district court attempts to support this conclusion by citing to <u>Journe</u> v. <u>Journe</u>, 911 F. Supp. 43, 47-48 (D.P.R. 1995), a district court case that is not

applicable to the present set of facts. <u>Journe</u> addressed a situation where a father voluntarily dismissed a custody action he had filed in his home country of France before seeking relief under the Convention in the United States. <u>Id.</u> at 48. The court ultimately concluded that the father had waived any rights under the Convention and ICARA by foregoing the opportunity to contest custody in the French courts. <u>Id.</u>

The district court's reliance on <u>Journe</u> is misplaced: a father's voluntary dismissal of a custody action instituted by him in his own country is worlds away from a father signing a document, drafted by the mother in her country, to provide for the education and health care of his son due to the fact that he is forced to return to his home country and leave that child behind. Unlike the situation in <u>Journe</u>, Darín never had an opportunity to assert his parental rights in front of a magistrate. He even testified that when he sought help with his situation from the Argentine consulate, he found out he would not be able to get free legal representation because he was not an American citizen. In sum, the Affidavit provides no support for Olivero's acquiescence defense. We proceed to her other arguments.

Next, Olivero contends that Darín's acquiescence can be inferred from some of his actions after he left Puerto Rico. She first directs our attention to Darín's filing of the instant petition for return in December 2011 -- a point the district court

also found significant.  Olivero says this "delay" in filing is inconsistent with Darín opposing LAD's relocation to the United States.  We are not convinced.  That Darín took around five months to file the petition after he was back in Argentina is not enough to constitute acquiescence.[24]

First off, the fact that Darín officially filed on December 19, 2011 does not mean he decided to pursue legal action on that day.  He must, it stands to reason, have had to inquire and taken some steps prior to the actual physical filing of his petition with the Argentina Central Authority.  And, in fact, the record shows Darín was looking at alternatives while in Argentina before resorting to the remedy provided by the Convention.  Darín testified he was making the necessary inquiries during that time and was holding out hope that Olivero would come around.[25]  He also testified that he waited to file the petition because Olivero was telling him "that she needed to think and that she was going to go back [to Argentina]."[26]  It is not unreasonable for Darín to hope

---

[24] It is undisputed that Darín arrived in Argentina on July 10, 2011 and filed the petition for return on December 19, 2011.

[25] "I knew everything that this would entail at that time that I was over there and I'm making my inquiries. And I learned that, unfortunately, with this, [LAD] is going to lose in any way. And, also, because I had the hope that [Olivero] would realize that what she did was wrong."

[26] "[A]nd, in addition to that, she told me that she needed time to think, that [LAD] was going to come back with me -- and those were her words, those were her sister's words, and those were her mother's words."

Olivero would change her mind and return to Argentina with the child. After all, she had done this before in March of 2010, and some of her trips to Puerto Rico had lasted months, yet she always went back to Argentina in the end. Additionally, according to the letter dated December 23, 2011 from the Argentina Central Authority to the U.S. Department of State's Office of Children's Issues, Darín had been trying to convince Olivero to return to Argentina with LAD since his own return there. The fact that the Argentina Central Authority recognized Darín's efforts during this period in official documentation does not weigh lightly on us.

Furthermore, the Convention itself allows for a petition to be filed up to a year after the wrongful retention. See Convention, supra Article 12 at 1502. And even when a petition is filed after the one year period, there are instances where a federal court may still order a child's return. See Yaman v. Yaman, 730 F.3d 1, 13 (1st Cir. 2013) (finding Article 12's one-year period did not operate as a statute of limitations). To say that Darín acquiesced because he filed within the time prescribed by the Convention is irrational. It would render the Convention's one year provision pointless. As it stands, Darín had a full year to file his petition, and he did file within that year. In this particular instance, the passage of time between Darín's departure from the United States and his filing of a timely petition for return is not probative of acquiescence.

Olivero makes a related argument that Darín only filed because LAD would not be going to Argentina for Christmas and because she had filed for custody. But this argument actually strengthens Darín's position that he did not acquiesce to his son remaining in the United States. Assuming Darín was on notice of Olivero's filing for custody in Puerto Rico, it is not unreasonable to think that this caused him to believe that her expressed intentions of staying on the island permanently, which in the past had proved illusory, were real this time, prompting him to pursue a legal course of action himself.

Olivero gets no more traction with her claim that Darín's acquiescence is evidenced by his regular communications with their son and their son's school, as well as the fact that Darín sent LAD a care package with school clothes and toys. These things do nothing more than show Darín's intention to be involved in his child's life, which we note is consistent with his statement in the Affidavit that he was not abandoning his son.

Olivero bore the burden of proving the affirmative defense of acquiescence by a preponderance of the evidence. Having carefully reviewed the entire record, we conclude that there is no evidence from which a reasonable fact finder could plausibly infer Darín acquiesced to his son remaining in the United States. Quite to the contrary, the record shows Darín's position has remained the same since being informed of Olivero's intentions to stay in the

United States in mid-March 2011: his son should return to Argentina.  Olivero has failed to establish the affirmative defense of acquiescence.

## VIII. LEGAL COSTS, ATTORNEY'S FEES AND TRAVEL EXPENSES

As a final matter, Darín seeks payment of his legal costs, attorney's fees and travel expenses pursuant to Article 26 of the Convention and 42 U.S.C. § 11607.  An award of necessary expenses -- including legal fees and costs, as well as transportation expenses related to the return of a child -- is appropriate when a court orders the return of a child.  42 U.S.C. § 11607(b)(3).  Nevertheless, the respondent in a return action has the opportunity to show why an award of necessary expenses to a prevailing petitioner would be clearly inappropriate.  Id. ("Any court ordering the return of a child pursuant to an action brought under section 11603 of this title shall order the respondent to pay necessary expenses incurred by or on behalf of the petitioner . . . unless the respondent establishes that such order would be clearly inappropriate.");  see also Whallon, 356 F.3d at 140 (finding the respondent has the burden to establish that a fee or expense order would be clearly inappropriate).

The district court did not address this matter, given its finding that there was no wrongful retention.  Accordingly, the issue of whether Darín is entitled to court costs, attorney's fees and transportation expenses, and if so, the amount to be awarded,

is remanded to the district court for consideration and disposition.

## IX. CONCLUSION

The district court erred in concluding there was no wrongful retention in this case. There is no evidence in the entire record to plausibly support the district court's finding that the parties arrived at a mutual intent to change LAD's habitual residence from Argentina to the United States. The record is also devoid of any objective facts showing a change in habitual residence. Argentina was LAD's habitual residence in mid-March 2011. Because Darín had custody rights over LAD and was exercising those rights at the time of the retention, it follows that Darín has established wrongful retention by a preponderance of the evidence. Because Olivero did not introduce sufficient evidence to establish Darín's consent or acquiescence to this retention, we order the return of LAD to Argentina. Any further custody proceedings must take place in the Argentine courts.

We do not make this decision lightly, especially because there is a young boy involved. Olivero's argument that LAD had already acclimatized to Puerto Rico when Darín filed his return petition -- he had finished summer camp, concluded his first semester of school and had developed strong ties with his maternal

family -- is extraneous to our analysis.[27]  We recognize that the child has been living in Puerto Rico for three years now.  However, retaining the child in the United States against his father's wishes was a decision Olivero made on her own.  If we allow a parent to unilaterally change a child's habitual residence simply due to the passage of time, we would be encouraging the pursuit of this illegal route to custody.  To not order the child's return would be to condone that which the Convention seeks to deter: parents crossing international boundaries with their children in order to avoid the jurisdiction of local courts whose rulings they do not -- or believe they will not -- agree with.  See Shealy v. Shealy, 295 F.3d 1117, 1121 (10th Cir. 2002).

     To be clear, the district court's conclusion that "the Puerto Rico courts have jurisdiction to determine permanently the best interests of the child and to rule on any controversies between the parties regarding parental custody and visitation rights" cannot stand.  Our decision today voids this determination.  It is the Argentine courts that have jurisdiction.  There is no reason to believe an Argentine court will not make a custody

---

[27] The so-called "now-settled" exception to the Convention's requirement that a wrongfully retained child be returned to the place of habitual residence applies in cases where the petition has been filed more than a year following the unlawful retention.  See Yaman, 730 F.3d at 4 ("[Article 12's] one-year period . . . must elapse before a parent can assert the 'now settled' defense.").  This is clearly not the situation at bar, where there is no issue as to the petition being filed within a year of the wrongful retention.

determination in a responsible manner.  <u>See</u> <u>Abbott</u>, 560 U.S. at 20.

For the reasons stated above, we REVERSE the district court's August 16, 2012 order, and ORDER the return of LAD to Argentina.  We reiterate that with this determination we are not resolving the underlying issue of child custody.  Olivero may ultimately prevail in her quest to obtain full custody of LAD, but this is a determination for the Argentine courts to make.

The issue of court costs, legal fees and transportation expenses is REMANDED to the district court for a determination consistent with this opinion.