# United States Court of Appeals
## For the First Circuit

No. 13-9001

IN RE DAVID O'DONNELL,

Debtor.

THOMAS A. TOYE III,

Appellee,

v.

DAVID O'DONNELL,

Appellant.

APPEAL FROM THE BANKRUPTCY APPELLATE PANEL
FOR THE FIRST CIRCUIT

Before

Torruella, Selya and Thompson,
<u>Circuit Judges</u>.

<u>James F. Molleur</u>, with whom <u>Molleur Law Office</u> was on brief, for appellant.
<u>Kelly W. McDonald</u>, with whom <u>Murray, Plumb & Murray</u> was on brief, for appellee.

August 26, 2013

**THOMPSON, <u>Circuit Judge</u>**.

## Overview

David O'Donnell wants what every debtor in bankruptcy wants — a fresh start.  You see, a debtor generally gets a discharge from debts owed at the time he files his bankruptcy petition.  <u>See</u> 11 U.S.C. § 727(b).  But this fresh-start opportunity is only for "the honest but unfortunate debtor."  <u>Grogan</u> v. <u>Garner</u>, 498 U.S. 279, 286-87 (1991) (internal quotation marks omitted).  And that is why Congress enacted a number of exceptions to discharge.  One makes debts for money procured by use of a written statement nondischargeable — provided that that statement was "materially false," related to the "debtor's . . . financial condition," and "reasonably relied" on by the creditor, and provided also "that the debtor caused [it] to be made or published with intent to deceive . . . ."  11 U.S.C. § 523(a)(2)(B).  An honest but unfortunate debtor O'Donnell is not — or so a bankruptcy judge, relying on this exception, ruled after a trial in a proceeding between O'Donnell and one of his creditors, Thomas Toye III.  The bankruptcy appellate panel ("BAP," for short) later affirmed.  Now O'Donnell asks us to hold that the bankruptcy judge got it all wrong.  What follows is our explanation of why this ruling must stand.

-2-

**How the Case Got Here**[1]

<u>Fishy Financials</u>

O'Donnell is an experienced real estate developer, jumping into the field in the late 1990s. Eventually he teamed up with Rudy Ferrante (a childhood friend), and the two began acquiring real estate together, apparently through "LLCs" (limited-liability companies, for the uninitiated). The pair were quite busy in the late 2000s, doing multiple deals. We discuss three — including the one that landed O'Donnell in this mess — to give a sense of what the trial was about. All three occurred within months of each other and featured Kevin Smith in a starring role. A longtime acquaintance of Ferrante (they had once worked together as brokers at the Lenders Network), Smith's supposed forte is real-estate financing.

The first deal involved team O'Donnell/Ferrante's bid to refinance a piece of commercial property already in their portfolio. The second involved their attempt to acquire more

---

[1] The facts recounted are either undisputed or based on the bankruptcy judge's not-clearly-erroneous findings. The parties spar over the effect of certain documents marked for identification at trial but not introduced, though they agree that the bankruptcy judge did not rely on them. We do not rely on them either. But O'Donnell did testify — without objection — from his personal knowledge about the documents, and under these circumstances, that testimony is fair game for us to consider. <u>See</u> <u>United States</u> v. <u>Rodríquez-Durán</u>, 507 F.3d 749, 774-75 (1st Cir. 2007) (concluding that a witness's testimony touching on the content of a document marked as an exhibit but not admitted into evidence sufficed to support the lower court's decision).

commercial property. For the first transaction, O'Donnell and Ferrante asked Smith to prepare the financial paperwork. For the second, O'Donnell asked Smith to help arrange the financing. "I didn't ask him to help do the paperwork," O'Donnell added, that just came "with the job." Smith said yes both times. And, among other things, he ended up preparing various financial documents, including O'Donnell's personal financial statements ("PFSs," from here on out).

O'Donnell was no stranger to PFSs. He knew from past deals that lenders wanted them, usually along with personal guaranties. And he gave Smith some pertinent financial information to prepare PFSs for both undertakings. Smith got other important data from documents he had gathered. O'Donnell had what seemed to be a hands-off attitude when it came to putting financials together, "delegating" the bulk of the paperwork to Smith and relying on him "to know what to do and how to do it" — an arrangement O'Donnell was "very comfortable with." Smith sent O'Donnell's PFS to the lender in the first deal. How the lender in the second deal got O'Donnell's PFS is unclear on this record.

Now we come to the transaction that sparked this litigation. Hard on the heels of these two earlier deals, O'Donnell and Ferrante, through an LLC called Alder Street Properties, LLC, agreed to buy some more property from another party. As part of this transaction, they had to come up with a $350,000 down payment

at closing. Once again, they recruited Smith to help secure the financing. And Smith asked Thomas Toye to loan the O'Donnell/Ferrante LLC the money. A highflyer in the local-business community who had known Smith for years (Smith had hooked him up three or four times with similar loan deals before), Toye said yes, but he wanted (among other things) O'Donnell's and Ferrante's personal guaranties for the loan's repayment. No problem, O'Donnell and Ferrante essentially said.

So Smith set about preparing PFSs for both. O'Donnell collected documents showing what stocks he owned and how much money he had in the bank and gave them to Smith. No one disputes the accuracy of this financial information. Smith also managed to get other relevant data from other documents (credit reports, mortgage statements, tax-assessment records, etc.) he already had on file or had dug up through public-record searches he had conducted for this deal. He cannot definitively say how he got some of the documents, however. Nor can he say for sure whether he sent O'Donnell a copy of the PFS, whether he reviewed every aspect of the PFS with him, or whether he saw him sign the PFS. But he does remember emailing a signed copy of O'Donnell's PFS, along with Ferrante's, to Toye. For his part, O'Donnell insists that he never reviewed the PFS, that the signature on the PFS is not his, and that he never authorized anyone to send the PFS to Toye. What everyone now agrees on, however, is that O'Donnell's PFS was "materially false,"

containing serious misrepresentations and omissions regarding his income and assets.

Wowed by O'Donnell's (supposed) net worth, Toye lent the O'Donnell/Ferrante LLC the $350,000, receiving a promissory note in that amount (at 13.50% interest) from the LLC secured by a mortgage on some property and by O'Donnell's and Ferrante's personal guaranties. Unfortunately, the LLC did not pay the loan as required. And Toye ended up turning to O'Donnell, who, also unfortunately, defaulted on his personal-guaranty obligations.

### A Wave of Litigation

Unwilling to take this lying down, Toye sued O'Donnell in state court on the personal guaranty. O'Donnell (supposedly) first saw the false PFS here, in state court. Eventually that court granted Toye summary judgment and entered a $417,974 judgment against O'Donnell.

Later, O'Donnell sought bankruptcy protection under Chapter 7 of the Bankruptcy Code. Toye responded by initiating this adversary proceeding in the bankruptcy court, alleging most relevantly here that O'Donnell's debt to him was nondischargeable per section 523(a)(2)(B). Under this provision (the reader will recall), if a statement about a debtor's "financial condition" is in a "writing" that is "materially false" and is "reasonably relied" on by the creditor, and if the debtor "caused [that statement] to be made or published with intent to deceive," then

-6-

the debt cannot be discharged.  Of course, Toye had to prove nondischargeability by a preponderance of the evidence.  See, e.g., Sharfarz v. Goquen (In re Goquen), 691 F.3d 62, 68 (1st Cir. 2012).

Highlighting only what is needed to understand the issues before us, we note that the parties basically stipulated to everything pretrial except whether O'Donnell had "caused [the PFS] to be made or published with intent to deceive."  At trial, Toye, Smith, and O'Donnell took the stand.  And after hearing their testimony and examining the exhibits, the bankruptcy judge refused to discharge O'Donnell's debt to Toye.

The judge began his reasoning this way:  Contrary to O'Donnell's contention, Smith had acted as his — not Toye's — agent for this transaction.  O'Donnell needed a $350,000 loan, and Smith said he could make it happen.  "O'Donnell said to Smith, go ahead and give [Toye] what he needs" to make the loan, the judge wrote, so Smith prepared the PFS "on the authority and at the instruction of" O'Donnell, "and no one else."  In other words, O'Donnell (to quote the judge again) "set" the wheels "in motion" for Smith to prepare and send the PFS to Toye.

True, O'Donnell did not "review and sign" the PFS, the judge added.  But, the judge ruled, nondischargeability under section 523(a)(2)(B) lies "whether the debtor intentionally did exactly what was done" or whether he was "reckless[ly]" indifferent to "the propositions asserted in the [PFS]."  And here, according to the

-7-

judge, the evidence showed that O'Donnell "willfully turned a blind eye" to what the PFS said.[2]  And, the judge concluded, O'Donnell did "not car[e]" what the PFS said, only that it said whatever Toye needed to hear to make the loan.

An unhappy O'Donnell appealed.  But the BAP affirmed the judgment, ruling (pertinently for our situation) that the evidence amply demonstrated that Smith was O'Donnell's agent and that by having his agent prepare and send the PFS O'Donnell had (in the lingo of section 523(a)(2)(B)) "caused [the PFS] to be made or published . . . ."  Turning to the question of intent, the BAP said that a debtor's reckless indifference to the accuracy of the submitted PFS satisfies the intent-to-deceive element of section 523(a)(2)(B).  And, the BAP stressed, the evidence of O'Donnell's turning a blind eye here proved his intent to deceive.

Which brings us to today, with a still unhappy O'Donnell asking us to undo this result.

**Our Take on the Case**

<u>Background Legal Principles</u>

Before we go any further, a few reminders are in order.  We are the second set of reviewers here — the BAP was the first, obviously.  But we give the BAP's decision no special deference.

---

[2] For those curious about the fate of O'Donnell's cohort, we see that the same bankruptcy judge had (in an earlier proceeding) also declared Ferrante's debt to Toye nondischargeable under section 523(a)(2)(B).  There is nothing indicating that Ferrante appealed that ruling.

See, e.g., Goguen, 691 F.3d at 68. Rather, we focus on the bankruptcy judge's ruling, giving clear-error review to factfindings and fresh review to legal conclusions. Id. Of course, if there are a couple of plausible ways to view the evidence, the judge's preference for one over the other cannot be clear error. See, e.g., Berliner v. Pappalardo (In re Sullivan), 674 F.3d 65, 70 (1st Cir. 2012). And to find clear error, a finding must hit us as more than probably wrong — it must prompt "a strong, unyielding belief, based on the whole of the record," that the judge made a mistake. Islamic Inv. Co. of the Gulf (Bah.) Ltd. v. Harper (In re Grand Jury Investigation), 545 F.3d 21, 24 (1st Cir. 2008); accord Goguen, 691 F.3d at 69. The case for deferring to the bankruptcy judge's factfinding is "particularly strong" when intent is at issue — since an intent finding depends heavily on the debtor's credibility, and the bankruptcy judge is uniquely qualified to make that call. See, e.g., Palmacci v. Umpierrez, 121 F.3d 781, 785 (1st Cir. 1997). And finally, because a principal goal of the Bankruptcy Code is to provide deserving debtors with a fresh start, we read exceptions to dischargeability narrowly. See, e.g., Goguen, 691 F.3d at 68. Consequently, a person in Toye's position must show that his claim fits snugly within an exception contained in the Code. See, e.g., id.

Now on to the issues in play.

<u>Issues Presented</u>

As framed by the parties, the case turns entirely on the final element of section 523(a)(2)(B): whether O'Donnell "caused [the "writing," <u>i.e.</u>, the PFS] to be made or published with intent to deceive." <u>See</u> § 523(a)(2)(B)(iv).[3] The gist of O'Donnell's argument is straightforward enough: Despite what the bankruptcy judge thought, one cannot conclude that O'Donnell "caused" the PFS — which he neither reviewed nor signed — "to be made or published," because Smith was functioning as <u>Toye</u>'s agent. And with this PFS the work of a runaway Smith, one also cannot conclude that O'Donnell intended to deceive Toye with a shady PFS. Toye disagrees, naturally. And we do too.

---

[3] Relying on <u>Kaspar</u> v. <u>Bellco First Fed. Credit Union (In re Kaspar)</u>, 125 F.3d 1358 (10th Cir. 1997), among other sources, O'Donnell floats the suggestion that the PFS is not a "writing" under section 523(a)(2)(B). <u>See</u> 125 F.3d at 1359 (holding that "a computer generated statement of financial condition given in an application for credit neither seen nor signed by the debtor" is not "'a writing' within the meaning of § 523(a)(2)(B)"); <u>see also</u> <u>Collier on Bankruptcy</u> ¶ 523.08[2][a] (Alan N. Resnick & Henry J. Sommer eds., 16th ed. 2013) (discussing "[e]lement [n]o. 1 under [s]ection 523(a)(2)(B)" — "[s]tatement in [w]riting" — and noting that "the statement, to be 'in writing,' must have been either written by the debtor, signed by the debtor, or written by someone else but adopted and used by the debtor"). But he stipulated below that the dispute pivots "on the fourth prong of [s]ection 523(a)(2)(B)" — <u>i.e.</u>, the made-or-published-with-intent-to-deceive prong — so his <u>Kaspar</u>-based argument is off the table. <u>See, e.g.</u>, <u>Rodríquez</u> v. <u>Señor Frog's de la Isla, Inc.</u>, 642 F.3d 28, 34-35 (1st Cir. 2011) (discussing a stipulation's effect on litigation).

## Analysis

Take the agency issue.  To give his claim about Smith's being Toye's agent an aura of plausibility, O'Donnell plays up how Smith and Toye had known each other for years and how Smith had made Toye money three or four times by helping him lend others money before this deal went south.  But the problem for O'Donnell is that other evidence cuts against him.  Recall how Smith had helped O'Donnell and Ferrante on some deals right before the deal at issue, then how the duo had enlisted his help in getting the $350,000 loan, and finally how they had relied on him to prepare the necessary documents for all three transactions.  The bankruptcy judge chose to accept this evidence in deeming Smith O'Donnell's agent on this loan.  And the judge's view seems entirely plausible, certainly not "wrong with the force of a 5 week old, unrefrigerated, dead fish," which is what O'Donnell had to — but did not — show to get anywhere.  See S Indus., Inc. v. Centra 2000, Inc., 249 F.3d 625, 627 (7th Cir. 2001).  Ultimately, then, we are in no position to undo the judge's agency determination.  See Goguen, 691 F.3d at 69.

Wait a second, O'Donnell says.  Smith had "acted on his own" in drafting up the false PFS, which means that the bankruptcy judge clearly stumbled in finding that O'Donnell had "caused" that document "to be made or published" to Toye — at least that is what O'Donnell writes.  But what dooms this theory is that the judge expressly found that Smith had acted on O'Donnell's "authority" and

"instruction." And our patient review of the record leaves us convinced that the judge's view of the evidence is a permissible one: Keep in mind that O'Donnell is a savvy businessman. He knew that Toye needed a personal guaranty. He knew too that that would require a PFS without (he must have known) omissions. So O'Donnell gave Smith some financial information for the PFS, tasking him with doing whatever was necessary to get the loan done (more on this in a moment). And he knew from past experience that that would result in Smith's preparing the PFS and sending it to Toye — or so at least a factfinder could infer. Ever mindful that the clear-error standard leaves us no room to second-guess the trier's choices among plausible inferences, we easily reject O'Donnell's Smith-went-rogue thesis, which necessarily means that the rest of his argument on this score fails. See Anderson v. City of Bessemer City, 470 U.S. 564, 575 (1985) (holding that if, on whole-record review, the lower court's "account of the evidence is plausible," then we "may not reverse it even though convinced that had [we] been sitting as the trier of fact, [we] would have weighed the evidence differently").

That leaves the "intent to deceive" issue, with O'Donnell protesting that the bankruptcy judge rested the intent-to-deceive findings on air, basically. He reminds us, for starters, that he had neither reviewed nor signed the false PFS before Smith emailed it to Toye. Yes, but intent to deceive under section 523(a)(2)(B)

may be demonstrated by the debtor's knowledge of, <u>reckless</u> indifference to, or <u>reckless</u> disregard for the written statement's falsity. <u>See, e.g.</u>, <u>Nat'l Union Fire Ins. Co. of Pittsburgh v. Bonnanzio (In re Bonnanzio)</u>, 91 F.3d 296, 301 (2d Cir. 1996); <u>Ins. Co. of N. Am.</u> v. <u>Cohn (In re Cohn)</u>, 54 F.3d 1108, 1118-19 (3d Cir. 1995) (citing additional cases from the 6th, 10th, and 11th Circuits); <u>Morrison</u> v. <u>W. Builders of Amarillo, Inc. (In re Morrison)</u>, 555 F.3d 473, 482 (5th Cir. 2009).[4] Our caselaw holds that recklessness can suffice to prove the intent element under section 523(a)(2)(A) — section 523(a)(2)(B)'s statutory sidekick, <u>see</u> <u>Field</u> v. <u>Mans</u>, 516 U.S. 59, 66 (1995) — which (at the risk of oversimplification) makes nondischargeable any debt for money obtained by fraud, "other than a statement respecting the debtor's . . . financial condition." <u>Palmacci</u>, 121 F.3d at 785-86, 788-89 (quoting § 523(a)(2)(A)). And today we join our sibling circuits and hold that recklessness can suffice under section 523(a)(2)(B) too. Anyway, recklessness is where O'Donnell gets tripped up. We explain.

Because it would be a rare debtor who would concede that "deception was his purpose," courts can take account of the totality of the circumstances, including (as we just said) a debtor's recklessness. <u>Cohn</u>, 54 F.3d at 1118-19; <u>see also</u> 4 <u>Collier on Bankruptcy</u>, <u>supra</u>, ¶ 523.08[2][e][ii]. And that review

_____

[4] That is six circuits, for those keeping count.

reveals plenty of evidence from which a factfinder could infer recklessness on O'Donnell's part.

Once again, O'Donnell is no babe in the woods when it comes to real-estate financing.  Far from it.  He knew that Toye wanted a personal guaranty.  And because a guaranty is only worth something if the lender knows the borrower's financial status, he knew (and this is easily inferable) that Toye would want a comprehensive PFS providing the truth, the whole truth, and nothing but the truth — otherwise, why ask for one?  "[G]o ahead and give [Toye] what he needs," were O'Donnell's marching orders to Smith, the judge found, which suggests that O'Donnell took a hands-off approach to the PFS (just like he had before).  True, he did give Smith some financial items.  But, as his lawyer candidly conceded at oral argument, O'Donnell did not give Smith enough data to produce a complete PFS, which meant (and this is easily inferable too) that Smith had to come up with the missing information.  Also, a trier could draw a strong inference — as this one did — that O'Donnell knew that Toye had gotten the PFS.  O'Donnell knew this (at least inferentially) probably by the time Toye had approved the loan, and certainly by the time Toye had dispersed the loan proceeds (remember, Toye wanted O'Donnell's PFS before making the loan).  And yet O'Donnell never even tried to check his agent's work at any point, bolstering the judge's finding that he had "willfully turned a blind eye," "not caring" what the PFS said — though he clearly cared a lot

about getting his hands on Toye's money, which he "happily" took after "set[ting]" the false PFS "in motion."

Searching for a way out, O'Donnell complains that there is zero evidence of his giving Smith carte blanche, which, he argues, undercuts the intent-to-deceive findings. Hardly. A factfinder could infer — as this one apparently did — that O'Donnell's directing Smith to do the paperwork and then not ever asking to see it shows a carte-blanche attitude. O'Donnell also grumbles that he gave Smith accurate information, which, he maintains, cripples the intent-to-deceive findings. Not at all. What O'Donnell ignores is that his disclosure was so lacking in required information that Smith could not do a complete PFS. That is the rub. And a factfinder could infer — like this one basically did — that someone with O'Donnell's résumé should have known that and did know that.

The bottom line here is this: Given these particular circumstances, and knowing how famously deferential clear-error review is, see, e.g., Goquen, 691 F.3d at 69, especially when it comes to intent findings, see, e.g., Palmacci, 121 F.3d at 785, we simply are in no position to upset the bankruptcy judge's intent conclusion. See FDIC v. Reisman (In re Reisman), 149 B.R. 31, 38 (Bankr. S.D.N.Y. 1993) (rejecting a debtor's ostrich tactics, the court found an intent to deceive where the debtor knew that the bank required a PFS as a condition of a loan and that his accountant had submitted the PFS to the bank, and yet "did not

-15-

review [the PFS] or inquire as to [its] accuracy"); see also Citizens Bank of Washington Cnty. v. Wright (In re Wright), 299 B.R. 648, 660-61 (Bankr. M.D. Ga. 2003) (finding a "claim of ignorance" concerning the falsity of financial papers "unpersuasive because, if true, it was by [d]ebtor's own design" and so constituted recklessness on the debtor's part); First Commercial Bank v. Robinson (In re Robinson), 192 B.R. 569, 578 (N.D. Ala. 1996) (similar).  And that is that.

### Summing Up

We see no clear error in the bankruptcy judge's conclusion that Toye had satisfied his burden of proving that O'Donnell's debt is not dischargeable under section 523(a)(2)(B).  Consequently, we uphold the judge's decision and the BAP's affirmance of that decision.

**Affirmed, with Toye awarded his costs on appeal**.