# United States Court of Appeals
## For the First Circuit

No. 19-1150

ALEJANDRO A. DÍAZ-ALARCÓN,

Petitioner, Appellant,

v.

MICHELLE S. FLÁNDEZ-MARCEL,

Respondent, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Carmen Consuelo Cerezo, U.S. District Judge]

Before

Thompson, Kayatta, and Barron,
Circuit Judges.

Maricarmen Carrillo-Justiniano for appellant.
Steven P. Lausell Recurt, with whom Rafael E. Rodríguez Rivera
and Legal Aid Clinic, Community Law Office, Inc., Inter-American
University of Puerto Rico were on brief, for appellee.

November 27, 2019

**THOMPSON**, **Circuit Judge**.  It is not every day that a child-custody fight ends up in federal court.  But here we are.  Invoking the Hague Convention on the Civil Aspects of International Child Abduction ("Convention"), see Oct. 25, 1980, T.I.A.S. No. 11,670, 1343 U.N.T.S. 89, reprinted in 51 Fed. Reg. 10494-01 (Mar. 26, 1986), and its implementing statute, the International Child Abduction Remedies Act ("ICARA"), see 22 U.S.C. §§ 9001-11, Alejandro Díaz-Alarcón seeks return of his daughter from the United States to Chile.  To protect her privacy, we will call the daughter "ADF."  Opposing Díaz-Alarcón is ADF's mother, Michelle Flández-Marcel.  A federal district judge denied Díaz-Alarcón's petition. He appeals.  We affirm.

## Setting the Stage

### *Legal Basics*

Over one hundred countries — including the United States and Chile — are contracting parties to the Convention.  See *Status Table*, HCCH, https://www.hcch.net/en/instruments/conventions/status-table/?cid=24 (last visited Nov. 26, 2019).  Broadly speaking, the Convention aims to deter parents from abducting their children to a country whose courts might side with them in a custody battle. See Darín v. Olivero-Huffman, 746 F.3d 1, 7 (1st Cir. 2014); see generally Mozes v. Mozes, 239 F.3d 1067, 1069 (9th Cir. 2001) (noting that "[d]espite the image conjured by words like

- 2 -

'abduction' and 'force,' the Convention was not drafted in response to any concern about violent kidnappings by strangers" — instead, "[i]t was aimed . . . at the unilateral removal or retention of children by parents, guardians or close family members" (some quotation marks omitted)).[1] A federal statute — ICARA — implements the Convention by (among other things) allowing a parent to petition a federal or state court to return an abducted child to the child's country of habitual residence. See 22 U.S.C. § 9003(b). To prevail, the party seeking relief must establish by a preponderance of the evidence that the abductor "wrongfully removed or retained [the child] within the meaning of the Convention."[2] Id. § 9003(e)(1).

A petition-receiving court may not decide who should have custody, however. See Darín, 746 F.3d at 8; see also Walsh v. Walsh, 221 F.3d 204, 218 (1st Cir. 2000) (noting that because "[c]ourts are not to engage in a custody determination," it matters not "who is the better parent in the long run") (second quotation quoting Núñez-Escudero v. Tice-Menley, 58 F.3d 374, 377 (8th Cir. 1995)). And with narrow exceptions, the court must return the child to her country of habitual residence so that the courts of

_____

[1] "The Convention," however, "cease[s] to apply when the child attains the age of 16 years." Convention, art. 4.

[2] "Preponderance of the evidence" means "more likely true than not." See United States v. Marino, 833 F.3d 1, 8 (1st Cir. 2016).

- 3 -

*that* country can decide. See Darín, 746 F.3d at 8 (recognizing that "the Convention establishes a strong presumption in favor of returning a wrongfully removed or retained child").

As for the exceptions, we mention only two. The first is that a petition-receiving court need not order a return if "there is a grave risk that . . . return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation," see Convention, art. 13(b)[3] — and it's important to keep in mind (for reasons that will become clear later on) that when the alleged type of risk is "sexual abuse of a young child," the "policy of this country in enforcing the . . . Convention . . . is to view sexual abuse as an intolerable situation." See Danaipour v. McLarey, 286 F.3d 1, 14-15 (1st Cir. 2002) (from now on, Danaipour I).[4] The second is that a petition-receiving court need not order a return if "the child objects to

---

[3] "'[G]rave' means a more than serious risk, but it need not be an immediate risk." Charalambous v. Charalambous, 627 F.3d 462, 467 (1st Cir. 2010).

[4] For anyone wondering:

[T]he Convention assigns the task of making the "grave risk" determination to the court of the receiving country; here, this task includes the obligation to make any subsidiary factual findings needed to determine the nature and extent of any risk asserted as a defense to returning the child. The [Convention] does not give the courts of the country of habitual residence jurisdiction to answer the grave risk question.

Id. at 15.

- 4 -

being returned and has attained an age and degree of maturity at which it is appropriate to take account of [his or her] views." See Convention, art. 13.

So as not to diminish the Convention's policy against unsavory forum shopping, courts construe these exceptions narrowly, see Nicolson v. Pappalardo, 605 F.3d 100, 105 (1st Cir. 2010) — plus all facts supporting the grave-risk exception must be proved "by clear and convincing evidence,"[5] and all facts supporting the child-objection exception must be proved "by a preponderance of the evidence." See 22 U.S.C. § 9003(e)(2)(A), (B).

*The Abduction*[6]

Díaz-Alarcón and Flández-Marcel are Chilean nationals. Flández-Marcel gave birth to their daughter, ADF, in 2008, in Santiago, Chile. Díaz-Alarcón and Flández-Marcel married in 2009, separated in 2011, and divorced in 2014. They agreed that Flández-Marcel would have *patria potestad* (meaning "parental power") over

---

[5] "Clear and convincing evidence" means "highly probable," see Colorado v. New Mexico, 467 U.S. 310, 316 (1984), or "reasonably certain," see *Evidence: Clear and Convincing Evidence*, Black's Law Dictionary 674 (10th ed. 2014). It falls between preponderance of the evidence and proof beyond a reasonable doubt. See Addington v. Texas, 441 U.S. 418, 425 (1979).

[6] The relevant facts are not terribly complicated and are in part stipulated.

ADF, but that Díaz-Alarcón would have a "direct and regular relationship" with ADF through scheduled visits.

Rewind to 2011, after Díaz-Alarcón and Flández-Marcel had separated. Flández-Marcel met and began dating Héctor Pérez-Babilonia, a Puerto Rico resident. ADF eventually started spending time with Pérez-Babilonia. And in 2013 Díaz-Alarcón overheard ADF call Pérez-Babilonia "dad." Díaz-Alarcón, in his own words, "told [ADF] off," explaining that Pérez-Babilonia "wasn't her dad."

A few months later, Flández-Marcel had ADF evaluated by a child psychologist. And ADF got diagnosed with a possible "[a]djustment [d]isorder." The staff there also interviewed Díaz-Alarcón, Flández-Marcel, and Pérez-Babilonia. Díaz-Alarcón said that both he and Flández-Marcel had verbally and psychologically abused each other. Flández-Marcel, for her part, accused Díaz-Alarcón of psychologically abusing her. After the interviews, a social worker concluded that ADF had

> [a]lienation [s]yndrome, which describes the change that occurs when there are conflictive marital break ups, in which the children censure, criticize or reject one of their parents in an unjustified and/or exaggerated manner. This implies that one parent systematically and consciously programmes the children to denigrate the other.

Another social worker said that "it was demonstrated" that Díaz-Alarcón had not "mistreat[ed]" ADF, though adding that "it was demonstrated that the parents handled the family dynamic badly,

often being prone to including the girl in conflicts between [them]."

Fast forward to 2014, a couple of weeks after Díaz-Alarcón and Flández-Marcel got divorced. Flández-Marcel asked the authorities in Santiago to issue a protective order for ADF and her against Díaz-Alarcón, accusing him of having committed the crime of "threatening with no aggravating circumstances against persons" (excess capitalization omitted). The authorities issued the protective order, telling the police to give "priority status" to calls from Flández-Marcel and to "periodic[ally] patrol[]" her neighborhood. But they eventually closed the matter after the investigation unearthed no "information required to continue the case."

A few months later, in 2015, just before she married Pérez-Babilonia, Flández-Marcel asked a Chilean family court for permission to move to Puerto Rico for one year with ADF. In her petition, Flández-Marcel claimed that Díaz-Alarcón could not "be located." After somehow learning about the petition, Díaz-Alarcón formally opposed Flández-Marcel's request in papers filed with the court, saying she knew where he was and accusing her of being an unfit mother. The Chilean court then ordered Flández-Marcel to undergo a psycho-social evaluation, focusing on her parenting

skills.  A social worker interviewed ADF as part of the process.  And ADF told her that Díaz-Alarcón

> is a fighter[;] he always hits with a closed fist.  I've seen it.  If I say something to him, he hits me.  If I ask him a question, he hits me.  If I ask him if we can go to the park, he hits me.  That's how he was taught; violently.  His mum and dad told me.  Some other days he does not hit.

Asked by the social worker "to think of some positive aspects of her dad," ADF said that Díaz-Alarcón is "a happy and loving person" who "gives kisses" and "affection."  But she added that he "doesn't listen" when she tells him "he shouldn't hit [her] anymore."

After reviewing the evaluation, the Chilean court pushed Díaz-Alarcón and Flández-Marcel to reach an agreement.  And they eventually did, agreeing, for example, that Flández-Marcel could take ADF to Puerto Rico from December 26, 2015 to March 26, 2016 and that Díaz-Alarcón would have "constant communication" with ADF as well as "additional days of visits" when she returned to Chile.  The Chilean court entered the agreement as a final and enforceable judgment.

According to Díaz-Alarcón, Flández-Marcel and ADF were supposed to fly to Puerto Rico on December 26.  But because the two did not have return tickets, they could not board the plane.  So they flew out on December 27 instead.

Once there, Flández-Marcel enrolled ADF in school for the semester starting in January 2016.  Early in January, ADF had

- 8 -

a Skype call with Díaz-Alarcón. Flández-Marcel was present too. ADF told Díaz-Alarcón that she never wanted to speak with him again. He asked her why. And she, according to Flández-Marcel, just screamed, "Cut, cut, cut." So Flández-Marcel cut the call short.

Flández-Marcel repeatedly asked ADF what was going on. According to Flández-Marcel, at first ADF would not say. But one day — after learning that Flández-Marcel was pregnant — ADF started hitting her and then screamed, "Don't bathe me, don't bathe me, don't bathe me." "Who is going to bathe you?" Pérez-Babilonia asked. "Don't ask me," ADF said.

At some point (apparently in January or February 2016), ADF told Flández-Marcel and Pérez-Babilonia the following — at least according to Flández-Marcel's expert witness, Dr. Carol Romey: During a visit to his home when she was 5, Díaz-Alarcón had her take off her clothes to take a bath. He took off his clothes too, got into the tub, touched her "private parts," and (per Pérez-Babilonia) had her touch his. She then saw a "white-yellow liquid come out of his penis." After, he beat her "with a slipper[] many times all over," walked "to the kitchen," and made her "something to eat."[7]

---

[7] We will have more to say about this incident — on which so much depends — later in this opinion.

According to Díaz-Alarcón's expert witness, Dr. Judith Mercado-Colón, a social worker at ADF's school recommended that ADF undergo a psychological evaluation "because of emotional abuse by her father." The evaluation happened. But if an evaluation report exists, no one has told us where in the record we might find it.[8]

The deadline for ADF's return to Chile — March 26, 2016 — came and went without her showing up. And she remains in Puerto Rico to this very day.

*Díaz-Alarcón's Petition*

Convinced that Flández-Marcel had wrongfully retained ADF in violation of his custody rights, Díaz-Alarcón petitioned Puerto Rico's federal district court under the Convention and ICARA, seeking ADF's return. Hoping to defeat Díaz-Alarcón's petition, Flández-Marcel raised the grave-risk and child-objection defenses. The district judge referred the matter to a magistrate

---

[8] And because "[j]udges are not like pigs, hunting for truffles" hidden in the record, we have no have no obligation to look for it. See Rodríguez-Machado v. Shinseki, 700 F.3d 48, 50 (1st Cir. 2012) (per curiam) (alteration in original) (citation and quotation marks omitted).

judge for an evidentiary hearing and a recommendation.  See 28 U.S.C. § 636(b)(1)(B).

*The Magistrate Judge's Recommendation*

At the hearing, the magistrate judge heard testimony from Flández-Marcel, Dr. Romey (Flández-Marcel's expert, who submitted a report), Díaz-Alarcón, and Dr. Mercado-Colón (Díaz-Alarcón's expert, who submitted a report as well).  The magistrate judge also interviewed ADF (now aged ten) in chambers.[9]  Following the close of evidence and the filing of post-hearing memos, the magistrate judge issued a report and recommendation that reasoned this way.

On the grave-risk issue, the "critical question" being whether Díaz-Alarcón "sexually abused" ADF, the magistrate judge said that Dr. Romey (Flández-Marcel's expert) testified "convincingly . . . that [ADF] had suffered serious trauma and now suffers PTSD and anxiety."[10]  Dr. Romey, the magistrate judge added,

_____

[9] Helpfully and commendably, the parties stipulated that Chile was [ADF's] country of habitual residence before [Flández-Marcel] removed her to Puerto Rico; the removal breached [Díaz-Alarcón's] custody rights under Chilean law; [Díaz-Alarcón] was exercising his custody rights when [Flández-Marcel] removed [ADF] to Puerto Rico; [ADF] was not sixteen years old; and Chile and the United States are both contracting states to the . . . Convention.

[10] PTSD is short for post-traumatic stress disorder.  See Danaipour I, 286 F.3d at 10.

- 11 -

also found that ADF's relationship with Díaz-Alarcón is the only "trigger" for her "PTSD and anxiety" and that "she would be at grave risk of a psychotic break if she were to be placed under [his] care . . . until she can process her experiences." But in the magistrate judge's telling, Dr. Romey's "purpose . . . was to . . . assess[] . . . [ADF's] maturity" and current "psychological state," and so did "not speak directly to whether [Díaz-Alarcón] sexually abused [ADF]." Dr. Mercado-Colón (Díaz-Alarcón's expert) did "speak directly to that issue," the magistrate judge wrote. And having assessed ADF, Dr. Mercado-Colón "concluded that there was a suspicion of sexual abuse, just not by [Díaz-Alarcón]," given some "incongruences" in ADF's statements about the incident.[11] Ultimately, the magistrate judge said that while ADF "may be a victim of sexual abuse, a preponderance of the evidence does not show that [Díaz-Alarcón] abused her."

On the child-objection issue, the magistrate judge said that ADF "clearly objected to returning to Chile." Summarizing his in-chambers interview with ADF, the magistrate judge said that she knows the difference between telling the truth and telling a lie; is "intelligent and mature," having "a good understanding of the decision facing her and specific reasons for her . . .

_____

[11] We will touch on the "incongruences" stuff in next part of this opinion (discussing the district judge's decision).

- 12 -

opinion";[12] and had not been "coached when she conveyed that she wanted to stay in Puerto Rico" — "she did not appear to be unduly influenced by the wishes of others such that her answers did not change even after [the magistrate judge] impressed upon her the importance of telling the truth." And, the magistrate judge found, Dr. Romey's report and testimony — *e.g.*, that she has a "level of maturity clinically sufficient to be able to express her concerns and wishes in a reasoned and coherent manner" — supported these conclusions.

Based on his findings, the magistrate judge recommended that the district judge deny Díaz-Alarcón's petition because (in his opinion), while Flández-Marcel cannot show "by clear and convincing evidence that [ADF] would be at grave risk if returned to Chile," she can show "by a preponderance of the evidence that [ADF] is sufficiently mature to object to returning to Chile" and that she did so object.

_____

[12] Staying with that topic, we think that another quote from the magistrate judge deserves repeating here:

> Importantly, [ADF] had positive and negative things to say about her life both in Chile and Puerto Rico, which showed that it was not a black-and-white decision but rather one that she had weighed and considered. Her [mentioning] positive memories of Chile, including her favorite teacher and the beaches, shows a maturity in thought as she decided that those positive memories were outweighed by the negative.

Both sides objected to the magistrate judge's report and recommendation.  See 28 U.S.C. § 636(b)(1)(C); Fed. R. Civ. P. 72(b)(2).  Giving the issues fresh-eyed "de novo review," see Mercy Hosp., Inc. v. Mass. Nurses Ass'n, 429 F.3d 338, 343 (1st Cir. 2005), the district judge studied the materials and conducted her own in-chambers interview of ADF.  And the judge made the following findings and rulings (the district judge addressed the issues in an order different from the magistrate judge).

On the child-objection issue, the district judge adopted the magistrate judge's recommendation that Flández-Marcel proved by a preponderance of the evidence that ADF "is sufficiently mature to object to returning to Chile and that [she] does object to returning."  Still, the district judge noted that the fate of Díaz-Alarcón's petition pivoted "primarily" on Flández-Marcel's defense that ADF's "return to Chile would expose her to physical or psychological harm or would otherwise place her in an intolerable situation."

On the grave-risk issue, the district judge highlighted how the magistrate judge never asked ADF to go into the details of the sexual abuse.  Quoting the magistrate judge's interview with ADF, the district judge noted that after the magistrate judge asked her to explain what she thought about whether she wanted "to go

- 14 -

back to Chile" or "stay in Puerto Rico," she replied, "[if] I go to Chile he, if he [Díaz-Alarcón] finds out that I returned . . . , maybe he will come get me and he is going to do the same things he did before."  The district judge then pointed out that the magistrate judge later told her that "I know what you are talking about.  So I am not going to make you tell me the whole story again."  When ADF "referred to 'the same things he (the father) did before,'" the district judge concluded, "she was clearly referring to sexual abuse."[13]

        The district judge also disagreed with the magistrate judge's suggestion that Dr. Romey did not speak to the sexual-abuse allegation against Díaz-Alarcón.  Dr. Romey, the judge wrote, testified that Díaz-Alarcón's "presence" "would place [ADF] at great risk of a psychotic break."  And, the district judge then wrote, "when asked about which experiences caused this extreme anxiety and stress to [ADF], Dr. Romey described in detail the event narrated by [her] when her father went naked into the bathtub, touched her private parts, masturbated and ejaculated."

        The district judge also noted that Dr. Romey saw "no clinical indicators of exaggeration or unreliable reporting on [ADF's] part."  And the district judge indicated that ADF's "verbal

_____

    [13] The district judge added the "(the father)" parenthetical.

- 15 -

statements" to Drs. Romey and Mercado-Colón and to the judge herself were more notable for their commonalities than their differences — the "common elements" being her saying that when she was five or six, Díaz-Alarcón "told her she had to take a bath"; he took "his clothes off and go[t] into the bathtub with her"; he "touched her private parts while both were in the bathtub"; and "[s]he saw a yellow/white, thick liquid coming out of his penis."

Dr. Mercado-Colón, the district judge noted, saw some "inconsistencies" in the parties' accounts. One example: Dr. Mercado-Colón testified that "it . . . appears from the statements of the interviews" that ADF told Flández-Marcel and Pérez-Babilonia that Díaz-Alarcón "bathe[d] her and forced her to bathe" — but, according to Dr. Mercado-Colón, ADF told her (Dr. Mercado-Colón) that Flández-Marcel and Díaz-Alarcón "did not bathe her ever since she was a little girl." Another example: Dr. Mercado-Colón testified that Pérez-Babilonia reported that ADF disclosed that Díaz-Alarcón "touch[ed] [her] all [over] her body" — but, per Dr. Mercado-Colón, ADF "only mentioned the genital area" to her (Dr. Mercado-Colón). Last example: Dr. Mercado-Colón testified that Pérez-Babilonia said that ADF stated that Díaz-Alarcón "asked her [ADF] to touch him [Díaz-Alarcón]" — but, again according to Dr. Mercado-Colón, ADF's "statements" do not indicate that Díaz-Alarcón "asked her [ADF] to touch his [Díaz-Alarcón's] penis."

Yet the district judge found that every time Dr. Mercado-Colón "revisited the subject of the sexual abuse, [ADF] would provide the same details" — including "that her father touched her private parts, that she was in the bathtub, and he went into the bathtub naked, that a liquid came out of his penis that was yellow and sticky." And the district judge emphasized that "[t]hroughout the several interview sessions and the repeated questioning by Dr. Mercado[-Colón], [ADF] remained steadfast that it was [Díaz-Alarcón] who sexually abused her at his home."

Noting how "vivid[]" her memory of her interview with ADF was, the district judge later expressly found that ADF "had no doubt of who was her wrongdoer." "The who, what, when, and where of this event [were] reported by [ADF] in the same manner to Dr. Romey and [me]," the judge wrote. And having canvassed the record and considered the parties' arguments, the judge "conclud[ed], without hesitation after assessing [ADF's] demeanor during the entire interview in chambers, that her statement of sexual abuse by [Díaz-Alarcón] is credible." To quote again from the judge's rescript, "[w]hat [ADF] described in the language of a child were the acts of masturbation and ejaculation by her father after touching her vagina" — a description that was "credible, honest and heartfelt." So, the judge ruled, clear and convincing evidence

- 17 -

established that ADF faces a grave risk of harm if sent back to Chile.

And with that, the district judge dismissed Díaz-Alarcón's petition, precipitating this appeal.[14]

**Standard of Review**

In deciding cases like this, we "must" remember to

> let district courts do what district courts do best — make factual findings — and steel ourselves to respect what they find. While we review transcripts for a living, they listen to witnesses for a living. While we largely read briefs for a living, they assess the credibility of parties and witnesses for a living.

Taglieri v. Monasky, 907 F.3d 404, 408 (6th Cir. 2018); see also Cumpiano v. Banco Santander P.R., 902 F.2d 148, 152 (1st Cir. 1990). And given "the unchallenged superiority of [their] factfinding ability," see Salve Regina College v. Russell, 499 U.S. 225, 233 (1991), we review their factfinding only for "clear error," see Darín, 746 F.3d at 8.

But showing clear error — which Díaz-Alarcón must do to prevail — is no easy task. See, e.g., United States v. Cates, 897 F.3d 349, 352 (1st Cir. 2018) (calling clear error's "heights . . . difficult to scale"). It is not enough that a finding strikes us as possibly or even *probably* wrong. See Toye v. O'Donnell (In re O'Donnell), 728 F.3d 41, 45 (1st Cir. 2013). Rather, to quote

---

[14] We will note additional details as needed.

- 18 -

ourselves quoting the Seventh Circuit, the finding must be "wrong with the force of a 5 week old, unrefrigerated, *dead fish*."  See id. at 46 (emphasis added) (quoting S Indus., Inc. v. Centra 2000, Inc., 249 F.3d 625, 627 (7th Cir. 2001)).  Or, to quote ourselves quoting the Supreme Court, we must be left "with the *definite and firm* conviction" that the finding is "a mistake."  See United States v. Nygren, 933 F.3d 76, 82 (1st Cir. 2019) (emphasis added) (quoting United States v. U.S. Gypsum Co., 333 U.S. 364, 395 (1948)).

So the judge's choice between competing, but rational, views cannot be clearly erroneous.  See, e.g., Anderson v. City of Bessemer City, 470 U.S. 564, 573-74 (1985).  And plausible findings based on witness credibility "can virtually never be clear error." Id. at 575.  All of which means that we cannot stamp findings clearly erroneous just because we might have decided the matter differently.  See, e.g., Reich v. Newspapers of New Eng., Inc., 44 F.3d 1060, 1080 (1st Cir. 1995) (relying on Anderson, 470 U.S. at 574).

To complete the picture, while we review the judge's factual findings for clear error, we determine de novo whether she interpreted and applied the Convention correctly.  See, e.g., Neergaard-Colón v. Neergaard, 752 F.3d 526, 530 (1st Cir. 2014).

## Arguments and Analysis

Díaz-Alarcón challenges the district judge's grave-risk and child-objection conclusions.  We can begin —  and end — with his grave-risk contentions, aware (to echo a point voiced by Danaipour I) that

> [t]he policy under the Convention of . . . the United States government . . . is weighted towards protection of the child when there is credible evidence of sexual abuse, particularly when the child is so young and when the allegations involve abuse by a parent.  This policy informs the grave risk analysis.

286 F.3d at 16.

Díaz-Alarcón's first set of arguments is directed at the district judge's handling of the magistrate judge's recommendations — to no avail, Flández-Marcel argues; and we agree with her.

For example, Díaz-Alarcón essentially claims that the district judge erred by not seconding the magistrate judge's recommendation to accept Dr. Mercado-Colón 's no-sexual-abuse-by-Díaz-Alarcón conclusion.  Insisting that "Dr. Mercado[-Colón] testified that [ADF] would not be in grave risk to suffer harm if return[ed]," he also implies that the district judge had no choice but to find as the magistrate judge did.  But as Flández-Marcel points out, the problem for Díaz-Alarcón is that the district judge was legally empowered to "accept, reject, or modify, in whole or in part, the [magistrate judge's] findings or recommendations,"

see 28 U.S.C. § 636(b)(1); and she was legally required to "make a de novo determination of those portions of the [magistrate judge's] report or specified proposed findings or recommendations to which objection is made," see id. To be fair, the evidence certainly points in conflicting directions in spots. Yet Díaz-Alarcón cannot meet his burden of showing clear error merely by pointing to competing testimony. See Anderson, 470 U.S. at 573-74; see also United States v. Flete-Garcia, 925 F.3d 17, 26 (1st Cir. 2019) (explaining that if there are two permissible views of the evidence, "a [district] court's choice between those two competing [views] cannot be clearly erroneous"). And ultimately, the evidence that the district judge highlighted — which included statements by ADF that she found "credible, honest and heartfelt" — lend the kind of strength necessary for her grave-risk findings to pass clear-error inspection. See Anderson, 470 U.S. at 575.

Trying to undercut the plausibility of ADF's interview statements, Díaz-Alarcón says in the grave-risk section of his brief that Flández-Marcel "employ[ed] undue influence." But he does not seriously develop his single-sentence suggestion — for instance, he does not adequately explain why the district judge clearly erred in finding (based on her personal observation of ADF) that ADF's statements were "honest and heartfelt," a finding that runs counter to his undue-influence intimation. So we

- 21 -

consider the suggestion waived. See, e.g., United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990) (admonishing that "issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived").

Wait a minute, says Díaz-Alarcón. Caselaw holds that "absent special circumstances, a district judge may not reject the credibility determination of a magistrate judge without first hearing the testimony" herself. See United States v. Hernández-Rodríguez, 443 F.3d 138, 148 (1st Cir. 2006). And, his argument continues, the district judge here flouted this rule by rejecting the magistrate judge's "credibility determination" of Dr. Mercado-Colón "without hearing [her] live testimony." But we agree with Flández-Marcel that the district judge committed no such error. And that is because — in responding to Díaz-Alarcón's motion for a free transcript — the district judge stated in no uncertain terms that she "did not reject *any* credibility determination(s) made by the Magistrate-Judge concerning [Dr. Mercado-Colón's] findings."[15]

---

[15] 28 U.S.C. § 753(f) pertinently provides that a party requesting a free transcript must show "that the appeal is not frivolous (but presents a substantial question)." In his motion, Díaz-Alarcón argued (among other things) that his credibility-rejection argument was nonfrivolous. Because he "imputed, without basis, that the [district judge] rejected determinations of credibility by the Magistrate-Judge regarding testimony that was dispositive of the grave risk of harm defense," and because no other "substantial questions are presented on appeal," the judge denied his motion.

Instead, she simply considered Dr. Mercado-Colón's findings in the context of *all* the evidence — *i.e.*, she kicked around each bit of "'evidence submitted to the Magistrate-Judge,'" including "the personal interview of the minor in chambers and the testimonies of the parents" — in ruling that Flández-Marcel had established the grave-risk defense.

Díaz-Alarcón also implies that the district judge had to follow the magistrate judge's lead and side with Dr. Mercado-Colón over Dr. Romey, because Dr. Romey relied on "a narration of events made . . . to be used in this judicial proceeding." But he provides no on-point authority for why that matters. See generally Town of Norwood v. FERC, 202 F.3d 392, 405 (1st Cir. 2000) (emphasizing that "developing a sustained argument out of . . . legal precedents" is a litigant's job, not ours). Anyway, it seems clear to us that Dr. Mercado-Colón did the same thing. And so either way, this aspect of Díaz-Alarcón's argument is not a difference-maker.

Nor is Díaz-Alarcón's assertion that the district judge had to accept the magistrate judge's recommendation because "Dr. Mercado[-Colón] was the only expert in forensic sexual abuse evaluation." After all, Danaipour I makes clear that sometimes trial judges can "find that sexual abuse did or did not occur without the benefit of a full forensic evaluation." See 286 F.3d

- 23 -

at 19 n.14.  And Díaz-Alarcón has not persuasively explained why this is not one of those times.

Díaz-Alarcón's next set of arguments takes aim at the district judge's interview of ADF — again to no avail, Flández-Marcel says; and again we agree with her.

For starters, Díaz-Alarcón complains that the district judge "call[ed] [ADF] for an interview in private . . . on the sexual abuse allegation" — an interview that he says lacked "guarantees of trustworthiness."  But he gives us no indication that he objected to the chambers-interview procedure.  See generally Reyes-García v. Rodríguez & Del Valle, Inc., 82 F.3d 11, 14 (1st Cir. 1996) (noting that an appellant pushing an argument on appeal must show us that he "seasonably advanced and properly preserved [it] in the lower court").  Nor does he develop here any critique of that procedure beyond arguing that the sex-abuse questioning was unrelated to the ADF's objection to returning to Chile — an argument that falls on its own weight.  So we deem any challenge on this score waived, see Zannino, 895 F.2d at 17, without offering any opinion on the procedure's adequacy or fairness.

Repeating his just-rejected argument (that the district judge had to accept the magistrate judge's view of the record), Díaz-Alarcón contends that the district judge's "consideration of

new evidence" — *i.e.*, the district judge's interview of ADF — amounts to "an abuse of discretion" in "this case." This contention does not move the needle, however, because the law allowed her to "receive further evidence" as she decided de novo whether to "accept, reject, or modify" the magistrate judge's proposed findings or legal conclusions. See 28 U.S.C. § 636(b)(1); see also Fed. R. Civ. P. 72(b)(3).

Moving on, Díaz-Alarcón writes that the district judge could have ordered ADF back to Chile without putting her in harm's way by imposing "undertakings" — *i.e.*, enforceable conditions on her return designed to keep her safe. See Danaipour I, 286 F.3d at 21-23; see also Danaipour v. McLarey, 386 F.3d 289, 302-03 (1st Cir. 2004) (hereinafter, Danaipour II). Separating permissible undertakings from impermissible ones is complicated stuff, however. See Danaipour I, 286 F.3d at 21-23. There are concerns for "international comity" — an American court, for example, should do nothing that "would smack of coercion of the foreign court." Id. at 23-24; see also id. at 22 (discussing the need to "avoid the unseemliness of a U.S. court issuing orders for a foreign court to enforce, and the foreign court's possible noncompliance"). And there are concerns about "the appropriateness of undertakings when the abducting parent claims to be protecting the child from abuse," id. at 22 — some "authority," for instance, "indicat[es] that

- 25 -

undertakings should be used more sparingly when there is evidence that the abducting parent is attempting to protect the child from abuse," id. at 25; see also Danaipour II, 386 F.3d at 293 (holding that a district court's supportable finding that a child's return "would cause grave harm" makes "immaterial" petitioner's claim that the courts in the child's country of habitual residence "could take ameliorative actions to prevent further harm," adding that "[i]n such circumstances, [the Convention] does not require separate consideration either of undertakings or of steps which might be taken by the courts of the country of habitual residence"). Díaz-Alarcón has the burden of proof on the undertakings issue. See Danaipour I, 286 F.3d at 21, 26. But he deals with none of these complexities. Which is not the way to turn the tide in his favor, since failing to give "serious treatment [to] a complex issue . . . is not adequate to preserve the claim on appeal." See Tayag v. Lahey Clinic Hosp., Inc., 632 F.3d 788, 792 (1st Cir. 2011).

Díaz-Alarcón hinges his last set of arguments on caselaw indicating that a district judge "has discretion to order return even where such return poses a grave risk of harm or threatens to place the child in an intolerable situation." See Lozano v. Montoya Alvarez, 572 U.S. 1, 21 (2014) (Alito, J., concurring) (quotation marks omitted); see also Mauvais v. Herisse, 772 F.3d

6, 11 (1st Cir. 2014). As he sees it, the district judge "abused [her] discretion by not giving sufficient weight[,] if any," to Flández-Marcel's "inequitable conduct" (*e.g.*, "conceal[ing]" ADF from him and "undu[ly] influenc[ing]" her), to ADF's "interests" (*e.g.*, Flández-Marcel "disrupt[ed] the strong and stable relationships [ADF] had in Chile"), and to the Convention's "aims and objectives." Like Flández-Marcel, we see no reason to reverse.

Consider Díaz-Alarcón's contention that the district judge had no "awareness of [her] responsibility to weigh[] the relevant factors." He played up these factors below, however. And the district judge said that she considered the "evidence presented." "While a fuller explanation might have been helpful," we know "that the absence of a more detailed explanation does not amount to an abuse of discretion." See Yaman v. Yaman, 730 F.3d 1, 22 (1st Cir. 2013). As for the rest of his argument, his real complaint is essentially that the district judge should have given controlling weight to the interests that cut in favor of return. But "[s]uch relative weighting of interests by the district court . . . is not for [us] to second-guess, and especially not on an abuse of discretion analysis." See id.

Time for a summary. An appellant's odds of winning a clear-error challenge are not very good. See, e.g., Cates, 897 F.3d at 352. This is especially so here, given how the district

judge was uniquely situated to gauge ADF's credibility. See, e.g., United States v. McGregor, 650 F.3d 813, 820 (1st Cir. 2011). Sure, maybe the district judge could have made different credibility findings or weighed the evidence differently. But that does not make her at-issue findings clearly erroneous. Ultimately, because none of Díaz-Alarcón's arguments leaves us with a "definite or firm conviction" that the district judge made "a mistake" or, more odoriferously, convinces us that she was "wrong with the force of a 5 week old, unrefrigerated, dead fish," see Toye, 728 F.3d at 46, we cannot reverse her on the grave-risk issue — even if we would have reached a different a conclusion, see Anderson, 470 U.S. at 573. And given this ruling, we have no need to decide the child-objection issue.

## Final Words

For the reasons recorded above, we affirm the judgment entered below. No costs to either party.